Gants, J.
On February 11, 2000, at around 1:00 p.m., the initial public offering (“IPO”) of 4,100,000 shares in webMethods, Inc. (“WEBM”), a technology company specializing in business-to-business communication, began to be publicly traded on the NASDAQ. In what seemed then the natural order of things and what, in retrospect, appears to have been “irrational exuberance,” the opening share price of $35 per share rose within minutes of public trading to $189, eventually rising to $215 later that day. The plaintiff, Twin Fires Investment, LLC (“Twin Fires”), a limited liability company organized by the plaintiff Stephens Dunne (“Dunne”) and his accountant and business advisor, Rick Dlugasch (“Dlugasch”), for the sole purpose of purchasing shares in the WEBM IPO, contends that the defendant Andrew Finch (“Finch”), a stockbroker in the Wellesley office of the defendant Morgan Stanley Dean Witter & Co. (“Morgan Stanley”), had promised to allocate 75,000 shares in the IPO to Twin Fires but reneged on that promise. Since Dunne had issued Finch a futile sales order at around 1:10 p.m. on Februaiy 11 to sell 30,000 shares at the then-market price of $207 and an equally futile sales order at 2:50 p.m. to sell the remaining 45,000 shares at the then-market price of $197.85, Twin Fires contends that the breach of contract by Finch (and, through Finch, Morgan Stanley), cost it $12,487,940 in lost profits. Finch and Morgan Stanley contend that Finch simply took what is known in the trade as a General Expression of Interest (“GEI”) from Twin Fires and never committed Morgan Stanley to allocate 75,000 shares in the IPO to Twin Fires.
All parties waived their right to a juiy trial, and agreed to have all issues decided through a bench trial. This Court heard testimony from thirteen witnesses over nine days of trial between May 6 and May 20, 2002, and also read the testimony of fourteen witnesses who the parties agreed could testify via deposition. Based on the testimony at the trial and in those depositions, the exhibits admitted into evidence at trial, and the stipulations of the parties, viewed in light of the governing law, this Court makes the following findings of fact and conclusions of law.
Findings of Fact
Before finding the facts, candor obliges me to admit that it is extraordinarily difficult to find the facts in this case for at least five reasons. First, the version of events proffered by each party is implausible. Twin Fires argues that Finch guaranteed Dunne, Dlugasch, and another Twin Fires investor, William Kams, that at least 75,000 shares of the WEBM IPO would be allocated to Finch and that he would ensure that at least 75,000 IPO shares would be sold to Twin Fires at the initial offering price even though Finch reasonably should have known at the time that he would not be able to deliver on this promise, since only Fidelity Investments received an allocation of this size. Morgan Stanley argues that Finch said nothing that reasonably could have been construed to mean that he was promising to sell Twin Fires 75,000 shares of the IPO, and that Dunne and Dlugasch essentially devised a get-rich-quick scheme whereby they would falsely transform Finch’s acceptance of a GEI into a guarantee, feign outrage on Februaiy 11 that they had not received IPO shares they knew they would never get, and then demand that Morgan Stanley make good on this so-called commitment.
Second, this Court did not find either of the two principal witnesses for each side — Dunne and Finch— to be entirely credible. The evidence reflects that, at times, both have wandered from the truth when it served them and, here, both had a strong motive to recall conversations and events in a light favorable to them.
Third, there are no writings memorializing the understanding between Dunne and Finch. Nor are there any contemporaneous writings that discuss or make mention of that understanding.
Fourth, until the day of the IPO, there were no witnesses to either the in-person or telephone conversations between Dunne and Finch. There is no evidence that Finch discussed with anyone his conversations with Dunne, but abundant, albeit conflicting, evidence as to Dunne’s conversations with others about his discussions with Finch. Finch met only once with Dlugasch and Kams after he had twice met with Dunne, and his memory of this conversation differs greatly from theirs.
Fifth, the outcome of this case rests largely on Finch’s choice of words in his conversations with Dunne and his meeting with Dlugasch and Kams — essentially, Dunne contends that Finch offered him 75,000 shares in WEBM’s IPO and he accepted the offer, while Finch contends that he simply said he hoped that he would receive an allocation of those shares and Dunne expressed an interest in buying as many shares in the IPO as Finch could deliver. From this Court’s experience, a witness’s memory of what another person specifically said in the past is colored by what the witness understood was being said, so the witness’s memory of the words used are sometimes simply an articulation of his own understanding of what was meant. Separating out what was truly said from what the witness understood was meant is always difficult, especially when there is no documentation and so little witness corroboration as to what was actually said, but it is essential that it be done *544 here because that distinction may prove dispositive. Having discussed these difficulties, I shall now And the facts.
Andrew Finch graduated from Boston University in 1994, having majored in business and excelled at crew. He passed the Series 7 and Series 63 examinations needed to become a registered financial advisor in Massachusetts and other states and, in September 1997, he began as a stockbroker at the brokerage firm of Joseph Charles & Associates, Inc. (“Joseph Charles”). He received no formal training at Joseph Charles, only on-the-job training, mostly from another broker, Chris Esposito, who Finch viewed as his friend and mentor. Finch wanted to work at a larger brokerage firm so, in the summer of 1998, he joined Morgan Stanley as a stockbroker. After spending a few weeks as a stockbroker in Morgan Stanley’s Wellesley office, Finch received three weeks of formal training at Morgan Stanley’s New York headquarters, and then returned to Wellesley.
A broker’s compensation at Morgan Stanley is based on a percentage of the commissions he generates, referred to as his annual production. A broker receives between 25 to 40 percent of his annual production, with the actual percentage dependent on the size of his annual production. Virtually all of Finch’s commissions derived from customers that he had brought to Morgan Stanley and, as a novice broker, he had yet to bring in very many customers. His annual production for 1999 was $67,453, which placed him among the bottom third of brokers in the Wellesley office in terms of production. Finch believed that his annual compensation for that year was roughly $30,000.
Finch Brings the WEBM IPO to Morgan Stanley
One dinner with a friend who was employed as a sales manager at WEBM, however, presented an opportunity that had the potential to transform Finch’s career as a stockbroker. During that dinner, Finch’s friend, Albert Stefan, mentioned that he worked for a great private company that was considering going public some day. Finch said that he (Finch) would receive a large bonus if he could bring a company to Morgan Stanley’s Investment Banking Group that Morgan Stanley took public. Stefan urged him to call WEBM’s Chief Executive Officer, Phillip Merrick.
In March 1999, Finch acted on Stefan’s suggestion and tried to reach Merrick by telephone, but was able only to leave a message. Merrick returned the call and left a voicemail for Finch, saying that he would be interested in discussing with him the possibility of Morgan Stanley working with WEBM on a possible initial public offering. When they actually spoke together by telephone in a conference call, Merrick told Finch that his call had come just in time. Merrick explained that WEBM was holding a conference call with eligible investment banking firms within the next three weeks, that he had not yet spoken to anyone from Morgan Stanley, and that the window for bringing in new investment bankers was about to close. John Foley, the sales manager at the Wellesley office, who was a participant in the conference call, asked Merrick to send them by overnight delivery a set of audited financial statements and a business plan to get things moving as quickly as possible. Merrick sent these materials to the Wellesley office, which forwarded them to Ray Smesko, who directed Morgan Stanley’s Branch Originator Program, who forwarded them to the Investment Banking Group.
Finch learned that Morgan Stanley’s Investment Banking Group was not interested in underwriting WEBM’s IPO because it thought WEBM had insufficient revenue. Finch telephoned Merrick and asked if WEBM had any transactions in the pipeline that would boost revenue. Merrick told him about a deal that WEBM had not disclosed to Morgan Stanley that would bring in significant revenue over the next few years, and Finch arranged for this information to be relayed to Smesko. The investment bankers, upon learning of this anticipated revenue stream, became interested in pursuing the WEBM IPO, and set up a conference call with Merrick, Finch, and Rick Ryan, the Wellesley branch manager. During this conference call, the investment bankers agreed to fly to Virginia to meet Merrick and evaluate WEBM. After this conference call, Finch’s participation in the underwriting discussions regarding the WEBM IPO ended. He learned that Morgan Stanley was the lead underwriter for the WEBM IPO only when he saw it on the Internet on the ipo.com website in October or November 1999.
Finch Attempts to Curry Favor with WEBM’s Chief Executive Officer
The Branch Originator Program had been created by Morgan Stanley to encourage its retail brokers to explore with their financial service clients possible opportunities for Morgan Stanley’s investment bankers. A retail broker who identified a lead with a company that Morgan Stanley had no prior relationship with and who influenced the company to retain Morgan Stanley as its investment banker was deemed the “originator” of such an opportunity, and thereby became eligible to receive bonus compensation of up to ten percent of all the revenue derived from the transaction by Morgan Stanley, with the bonus capped at $500,000. As will be discussed below, by making his “cold call” to Merrick and bringing the WEBM IPO to Morgan Stanley, Finch was declared the “originator” of this transaction under this Program.
Even before WEBM chose Morgan Stanley as its lead underwriter, Finch spoke with others at Morgan Stanley as to what it meant to be the “originator” of this IPO and how he could maximize the personal benefit to him. He learned that he would receive a “finder’s fee” as the “originator” and that the quality of his relationship with Merrick would be an important factor in Morgan Stanley’s determination as to the size *545 of that “finder’s fee.” He also learned of a number of other avenues by which he could leverage his origination of this IPO into an enormous and sustained increase in his annual production and, thus, his annual compensation.
First, he learned that he could become the broker for the WEBM Directed Shares Program, whereby IPO shares are directed specially to officers, employees, and friends of the issuing company, so that they may have an equity stake in the company after it becomes public and enjoy the anticipated increase in share price that routinely was occurring in high technology IPOs during this time period. In the WEBM IPO, 200,000 shares were set aside for the Directed Shares Program. If Finch were designated as the broker for those receiving WEBM IPO shares under this Program, he would not only enjoy the commissions that would derive from their subsequent sale of these shares but, more importantly, he would have an entree to become their stockbroker for all their assets, which would likely greatly increase in value as a result of their participation in the IPO.
Second, he hoped to parlay his relationship with Merrick to become Merrick’s personal financial advisor, brokering all Merrick’s securities transactions involving his personal assets. Since, from his knowledge of other high technology company IPOs, Finch expected that this IPO would make Merrick a rich man (if he were not already one), Finch thought this an important potential account.
Third, and most importantly, Finch learned that it was possible to receive an extra allocation of IPO shares for his clients for having brought in the deal. While initially it was unclear how he could obtain this additional allocation, it soon became apparent to Finch that any substantial increase in his allocation would have to come from a special request made by Merrick on Finch’s behalf. Finch discussed the possibility of a special allocation with Fred Caswell, who became the Wellesley branch manager in May 1999, and Gerald Curtis, the branch syndicate coordinator.[1] From these discussions, Finch believed that he probably would receive a special allocation if the IPO reached fruition. Finch also spoke with a Morgan Stanley broker in the Wellesley office, Steve Keller, who had been the originator of another IPO involving a high technology company. Keller told Finch that his contact at the issuing company had arranged to allocate between 250,000 and 300,000 IPO shares to Keller if the IPO went through. Prior to January 2000, however, before Finch first discussed the WEBM IPO with Dunne, Keller’s IPO fell through and he received no allocation of shares. As a result of these early discussions, Finch believed (1) that, if he played his cards right with Merrick, he would probably receive from Merrick a special allocation of shares; (2) that the special allocation could be as great as 250,000 to 300,000 shares; and (3) that everything depended upon the IPO going through. Indeed, in the summer of 1999, Finch told Katharine Dunne, the mother of plaintiff Stephens Dunne and of Finch’s sister’s husband, that he was going to receive between 200,000 and 300,000 IPO shares in WEBM for having brought WEBM to Morgan Stanley.[2]
Since so much depended upon Merrick, Finch attempted to build and solidify his relationship with him. He used his own money to fly to Virginia in mid-July 1999 to meet Merrick in person for the first time, and spoke with him for about thirly minutes. At the end of that meeting, Merrick told him he would wait until after the IPO to consider retaining other Morgan Stanley financial services. When Finch returned to his Wellesley office on July 21, 1999, he wrote Merrick a letter promising to send him an information packet later that day. He added, “I was pleased to have finally met you in person and am anxious to work with you in the future.”
Finch stayed in touch with Merrick by telephone or e-mail eveiy few weeks. In an e-mail dated October 15, 1999, Finch attempted to schedule another visit to Virginia to meet with Merrick again “in the next few months.” Merrick suggested a conference call on October 26 but the call never happened that day. Finch e-mailed Merrick later on October 26 expressing his understanding of how busy Merrick had become. He noted that Merrick’s Executive Assistant had arranged for them to speak on November 29. Finch explained only obliquely what he wanted to discuss with Merrick:
I mainly wanted to speak with you this afternoon to see how you felt the progress towards webMethods eventual public offering was going. I also wanted to cover some ground relating to the handling of certain aspects of such an offering.
On November 7, Merrick e-mailed Finch and suggested that they meet in Philadelphia at a technology convention that Merrick was planning to attend. Finch arranged with Merrick’s Executive Assistant to meet Merrick in Philadelphia on December 7, but Merrick later cancelled this meeting, too. On or just before November 29, after Finch learned that Merrick could not meet him in Philadelphia and after WEBM had filed its intent to become a publicly-traded company with the Securities and Exchange Commission (“SEC”),[3] Finch reached Merrick by telephone. During this telephone call, Merrick told Finch that Finch was not going to obtain either the Directed Shares Program or Merrick’s personal account. Finch understood that both had been won by Morgan Stanley’s Private Wealth Management group in New York but, from Merrick’s testimony, this Court finds that Private Wealth Management had won only Merrick’s personal account and that Merrick had told Morgan Stanley that he wanted broker in Virginia to handle WEBM’s Directed Shares Program.[4] After learning this news, Finch e-mailed Ryan that he was “(v]ery disappointed to say the least.” Later, Morgan Stanley arranged for Finch to split the *546 Directed Shares Program (and the commissions) with Jonathan Legg, a broker in Virginia who handled many high net worth clients.
Finch testified that, in his late November 1999 telephone call with Merrick, he asked Merrick for the first time to allocate shares to him and his branch. According to Finch, Merrick said, in substance, “sure, that would not be a problem,” and confirmed that Finch was in the Wellesley branch. I do not credit this testimony, for three reasons. First, Merrick did not recall Finch making this request and, more importantly, does not believe he told Finch that he would allocate shares to him and his branch. He testified that his standard response to such requests for allocation was to say, “I don’t know that we’ll have the opportunity to influence the allocation. To the extent that perhaps we can do that, I will see what we can do but I can’t make any promises or commitments.”
Second, if Merrick had indeed promised Finch a special allocation, one would think Finch would have made some mention of that good news in his e-mail to Ryan, who by this time was no longer his branch manager but still remained his mentor. Instead, that e-mail contains only disappointment. Finch wrote, “To find clients and bring them to the firm only to have them completely taken out from under you is unreal.”
Third, when Finch did specifically request from Merrick a special allocation of IPO shares in his letter dated January 5, 1999 (although sent on Januaiy 5, 2000), he made no mention of this earlier promise of a special allocation. If there had been such a promise, Finch would likely have reminded Merrick of it in some fashion in this letter. Indeed, if Finch had asked for an allocation and Merrick had given what he characterized as his standard response, Finch would likely have reminded him of it, because Merrick at least offered in his standard response to do what he could. Consequently, I find it more likely than not that Finch did not broach the topic of a special allocation at all during this conversation on or around November 29. If I am wrong and he did ask for an allocation, I find it more likely than not that Merrick’s response was closer to his standard response than Finch’s version.
Despite Finch’s disappointment with what he perceived to be the loss of Merrick’s personal account and of the Directed Shares Program, Finch persevered in offering to assist Merrick in matters regarding the IPO, no doubt in the hope of obtaining from Merrick a substantial share allocation. On December 7, 1999, Finch e-mailed Merrick to inform him that an old college friend of Finch’s was a columnist with the Wall Street Journal and had mentioned to Finch that she could write about any company she wanted. Finch in this e-mail wrote that he was furnishing Merrick with this information as “a heads up on something [he] may find useful either in the near term or in the future.”
Merrick responded with a curt e-mail observing that the Wall Street Journal had covered WEBM several times, and that WEBM could not speak to the business press during the “quiet period.” Merrick correctly understood that, under SEC rules, a company going public was barred from making any public pronouncements from the moment that it first registered its IPO with the SEC, which occurred on November 19, 1999 (known as the “pre-effective registration”), until the registration became effective, which occurs immediately before IPO shares go on the market. During this “quiet period,” the company going public can respond to inquiries only by providing a copy of its most recent preliminary prospectus, sometimes referred to as its “red herring.” Finch’s offer to Menrick to arrange for a Wall Street Journal interview regarding WEBM was at best, ill timed, and, more likely, a reflection of Finch’s ignorance of the SEC rules governing IPOs.
In December 1999, Finch had his annual performance review. In preparation for that review, Finch wrote a document setting forth his goals for 2000. In this document, Finch considered two scenarios, one in which the WEBM IPO reached fruition and another in which the WEBM IPO fell through. With the WEBM IPO, he set a goal of managing $400,000,000 in assets and earning more than $500,000 in gross commissions. Without the WEBM IPO, his goal was to bring in $5,000,000 in assets and earn $200,000 in gross commissions. Under both scenarios, he planned to bring in 100 new accounts. It is not clear what Finch was thinking when he prepared this document, and Caswell, his branch manager, certainly did not challenge the numbers during the performance review to cause Finch to think harder as to whether they were realistic. By the time he prepared this document, Finch had been told by Merrick that he was not going to get Merrick’s personal account and Finch had no reason to believe he would receive more than half the commissions derived from the Directed Shares Program. All that can be fairly inferred from the goals Finch declared for 2000 is that Finch believed that the WEBM IPO was somehow going to transform him from being a marginal broker into a brokerage superstar, increasing the assets under his management eighty fold, and that Caswell did nothing to dissuade Finch from that belief.
As the new millennium began and the IPO approached, Finch still had heard nothing from Merrick about a special share allocation. Consequently, on January 5, 2000,[5] Finch wrote Merrick a letter specifically asking for his help and sent it via overnight delivery. He wrote:
With the small size of this deal and the number of account executives across the country, there is normally a minute share allocation for any individual. I know that the only person capable of increasing that allocation is yourself and that is why I wanted to ask you the favor of directing additional shares for that purpose. I currently can expect to receive around 50 shares of this offering but would *547 obviously have no trouble allocating up to one hundred thousand shares webMethods. My intentions are to distribute webMethods only to those investors who realize the long-term value of your company.[6] I have an incredible interest in seeing this offering work well both as an IPO and in the future, and would love to have the opportunity to support your efforts thus far . . .
Merrick did not reply to this letter, either orally or in writing. Curiously, Finch did not follow up on this letter request with Merrick. The only e-mail Finch sent Merrick, dated January 21, 2000, simply made the observation that “[t]hings must be crazier down there heading into the road shows,” and concluded, “Hope everything is going well. Talk with you soon.” Yet, Finch did not soon speak with Merrick. Indeed, from the record at trial, Finch never spoke again with Merrick.
Finch wanted to explore with Smesko other possible ideas as to how to obtain a larger allocation. On January 12, 2000, Finch e-mailed Caswell to remind him to call Smesko regarding, among other matters, “how to go about getting shares for myself/office.” Nothing came of this e-mail, and Finch did not follow up on it himself.
WEBM IPO Shares as “Tickets to Wealth”
To understand Finch’s state of mind with respect to the WEBM IPO, one needs to understand the state of mind of the brokerage industry during this extraordinary “boom” period for technology stocks, especially IPOs. In 1999 and through the period leading up to the WEBM IPO (although not for long after), technology stocks were consistently rising in price at levels that, historically, were astronomical. IPOs were generally successful in the after-market; technology IPOs were even more successful; and technology IPOs involving business-to-business internet communications, which was WEBM’s line of business, were among the most successful. Success during this time period did not simply mean a modest increase from the initial offering share price; it meant that the after-market price would multiply within hours, sometimes by as much as 400 percent or, as happened with WEBM, by more than 600 percent. Consequently, while there are few guarantees in life, during this time period, the purchase of shares in a technology IPO at the initial offering price, combined with a quick exit strategy, was as close to a guarantee of a huge short-term profit as life offers in the stock market. Therefore, an investor who could obtain IPO shares at the initial offering price was virtually assured of an enormous profit, and if he could obtain a large quantity of these shares, he would get rich (if he were not already rich).
These “tickets to wealth” were not available to every investor. Rather, the allocation of these IPO shares was controlled primarily by the investment banking firms, like Morgan Stanley, who served as underwriters for these IPOs and allocated shares to favored institutional and private investors, and, to a lesser degree, by the IPO company itself, which was permitted to direct a certain amount of shares to its principals, officers, employees, and friends. To be blunt, underwriters, like Morgan Stanley, used these “tickets” to reward those institutional and private investors whom it deemed its best customers, and to encourage others to become its customers to enjoy the largesse it had the ability to hand out through these “tickets.” Suffice it to say, the average investor had no access to these “tickets" and was relegated to the after-market, where the profits were less and the risks far greater.
Morgan Stanley was among the largest underwriters of technology IPOs, and thereby had access to a great deal of these “tickets.” Morgan Stanley recognized that the potential for access to these “tickets” was a great draw to attract new accounts from private investors and to induce existing clients to invest greater amounts with Morgan Stanley. Since access to these “tickets” was so coveted, Morgan Stanley’s Retail Equity Syndicate carefully allocated the roughly thirty percent of IPO shares reserved for its retail side among its various retail branches and Private Wealth Management, and among the stockbrokers within those branches and Private Wealth Management. Although the Retail Equity Syndicate retained some discretion to make adjustments, the distribution of IPO shares among the branches was generally determined by a model based on two factors: (I) the magnitude of the branch’s participation in previous IPOs; and (2) the length of time the IPO shares were held by its customers in the after-market, since its public issuers preferred that its shares not be immediately flipped. Within the branch, the branch Syndicate Coordinator allocated the branch’s share among its brokers through a broker syndicate index that used the same two factors, albeit retaining the discretion to make adjustments among brokers. Through the normal distribution of these shares among retail brokers, a young broker like Finch, as he indicated in his January 5, 2000 letter to Merrick, was likely to be allocated a relatively small number of shares to allocate among his best customers. Finch testified that the largest allocation of IPO shares he ever received in the roughly twenty IPOs that preceded WEBM’s IPO during his tenure at Morgan Stanley was from two to three thousand shares. While a branch could ask the Retail Equity Syndicate for a greater allocation than dictated by the allocation model based on special circumstances, and a broker could invoke special circumstances to ask his Syndicate Coordinator for a greater allocation, such requests, even when honored, generally did not yield substantial increases in the amount of shares allocated to a particular broker.
Separate and apart from this general allocation, Morgan Stanley generally honored a request made by the Chief Executive Officer of the issuing company for a special allocation to a person, entity, or broker that *548 wished to reward. Indeed, Merrick did request that special allocation of WEBM IPO shares be made to a Morgan Stanley stockbroker, and Morgan Stanley honored this request. The special allocation that Merrick directed, however, was not to Finch, but to Jonathan Legg, the broker from Morgan Stanley’s Virginia branch, in the amount of 5,000 shares.[7]
There were no fixed rules, either written or oral, at Morgan Stanley that determined which clients would receive the IPO shares that had been allocated to a retail broker. While its general policy provided that IPO shares should be offered only to those clients with at least $100,000 in Morgan Stanley accounts, the policy was not enforced and Finch did not always adhere to it. Morgan Stanley, however, had a written policy that adopted the Conduct Rules of the National Association of Securities Dealers (“NASD”), which barred certain “prohibited persons” from participating in a “hot” IPO, either directly or through a conduit. A “hot” IPO referred to the expectation of a price increase in the after-market; the WEBM IPO was deemed by Morgan Stanley to be a “hot” IPO. Among the “prohibited persons” barred from participation in a “hot” IPO were members of the immediate family of the stockbroker, defined to include parents, parents-in-law, spouses, brothers, sisters, brothers-and sisters-in-law, children, or any relative that the broker helped to support. In short, Finch could allocate these “tickets” to whomever he pleased, as long as the buyer was not a “prohibited person.”
While Morgan Stanley, apart from barring participation by “prohibited persons,” did not interfere with a broker’s choice as to whom he sold IPO shares, it did limit the amount of IPO shares that any one retail client could receive. Without special permission, a retail client could not be allocated more than 2,000 shares of any IPO or more than 1,000 shares in any “hot” IPO. Therefore, no retail broker, without approval from a superior, could sell any single retail customer more than 1,000 shares in the WEBM IPO.
This policy was poorly communicated within Morgan Stanley. Finch was not aware of either the general 2,000 cap on all IPO shares, or the 1,000 cap for “hot” IPOs, and no one at Morgan Stanley told him of any such cap. Indeed, neither Caswell, the Wellesley branch manager, nor Gerald Curtis, Wellesley’s Syndicate Coordinator, knew of the 1,000 cap on WEBM shares until after public trading in those shares began on February 11, 2000.
As a result, if Finch obtained the substantial special allocation he was hoping to receive from Merrick, he believed he would have the power, at the age of 27, to dispense to whomever he chose, except “prohibited persons,” WEBM IPO shares whose value would multiply in the after-market. Not only would this make him the benefactor of friends and clients but, if used strategically, it could also ignite his career as a broker by attracting wealthy new clients and by inspiring current clients to invest more money with him, all with the expectation that he could deliver shares to them from this and other “hot” IPOs.
Finch Discusses the WEBM IPO with Clients, Family, and Friends
In the summer and fall of 1999, Finch traveled to Texas to visit three clients who resided there: David Hall, Andrew LeFave, and Andrew Sekel. He boasted to them that he had brought the WEBM IPO to Morgan Stanley, was working closely with WEBM’s Chief Executive Officer (“CEO”) to take the company public, and would receive a large allocation of IPO shares from this CEO. Hall said he wanted to purchase $100,000 worth of WEBM IPO shares, and Finch told him that he would be able to obtain these shares for him from his special allocation. LeFave told Finch that he wanted to invest all of the $125,000 in his Morgan Stanley account in WEBM IPO shares, and Finch said that there should be no problem to obtain enough shares for LeFave to be fully invested (or nearly fully invested) in WEBM shares. Sekel invested $100,000 in his Morgan Stanley account primarily to gain access to this IPO. Finch told him that his allocation would be large enough to permit him to sell Sekel $100,000 worth of WEBM shares, and still have enough for Hall and LeFave.
While Finch was trying to solidify his relationship with these investor clients by declaring his ability to obtain large quantities of WEBM shares, he was also trying to figure out how to make his sister and friends rich. Finch’s sister had married Dwight Dunne, Stephens Dunne’s younger brother. Finch and Dwight Dunne explored various ways in which Finch could sell WEBM IPO shares to Dwight despite the fact that Finch’s sister and brother-in-law were “prohibited persons” and thereby barred from purchasing shares of this “hot” IPO from him. They considered various alternatives, including selling shares to a trust controlled by Dwight and selling shares to Dwight’s daughter, but all these alternatives were rejected when they learned that indirect sales were barred to the same degree as direct sales. Instead, Dwight devised a scheme with a friend, Jordy Doran (“Doran”), who did research for an investment firm in Russia and was the brother of Missy Doran, Stephens Dunne’s then-girlfriend. Under this scheme, Doran would purchase $100,000 in WEBM shares from Finch, and a portion of the shares he would purchase would be beneficially owned by Dwight, who would wire Doran at least half the money needed to buy these shares. This scheme was plainly a fraudulent attempt to evade the “prohibited person” rule through the use of Doran as a conduit. This Court finds that Finch knew that Doran was, at least in part, a conduit for Dwight’s funds, and intended to allocate a large amount of WEBM shares to Doran precisely for this reason, since Doran was not a close friend of Finch. Finch also had intended, if he received the special allocation from Merrick, to sell *549 WEBM shares to a number of his friends: Gerald Keane, Matthew Feingold, Eric Luck,' and Chris Esposito, his former mentor from his days at Joseph Charles.
Stephens Dunne’s Discussions with Finch
Stephens Dunne learned of the WEBM IPO and Finch’s role in it from his brother, Dwight, in December 1999. Stephens knew Finch, although not well, since Finch’s sister was married to Dwight, Stephens’ brother. Dwight told Stephens about the opportunity to purchase a large quantity of WEBM IPO shares from Finch, and encouraged him to call Finch. Stephens had not yet called him when Dwight saw Stephens again at a birthday dinner for their sister later that month. When Dwight learned from Stephens that he had not called Finch, he urged him to make the call. When Stephens met with Rick Dlugasch, his accountant and business advisor, just before the end of the year, he mentioned the WEBM opportunity and they agreed that Stephens should follow up and call Finch.
Stephens Dunne is a direct descendant of John Deere, the founder of the farm equipment company that still bears his name. In January 2000, Dunne was engaged in the fine and commercial arts, both as an artist and as a businessman supporting other artists. Apart from his artwork and art business, he was also beginning to develop historic properties, mostly in the South End of Boston. While the matter was little discussed at trial, it is plain that his apparent wealth did not derive from either his art or development business but from his status as a beneficiary of the trust funds that arose from the John Deere fortune. He is not a trustee of any of those funds, but has observed their investment performance since he gained maturity. In short, his experience in the investment market derives from his being the beneficiary of investments made by others, not from being an active investor himself.
Stephens Dunne finally telephoned Finch at the Morgan Stanley Wellesley branch on or about January 17, 2000. Dunne testified that Finch told him during this telephone call that:
Finch learned about WEBM from a college friend and “cold-called” the WEBM CEO about going public:
since Finch helped to bring the IPO to Morgan Stanley, he would be given WEBM IPO shares to sell that Dunne could buy;
WEBM’s CEO was at a symposium sponsored by the Massachusetts Institute of Technology’s Media Laboratory where three or four of the principal developers of the Worldwide Web spoke of the need for a computer language to permit better communication on the Web. Merrick raised his hand and said that WEBM already had a language to solve this problem. Goldman Sachs, the Mayfair Fund, and Donald Dell of Dell Computers were so impressed that they all gave Merrick venture capital funds; and
Finch asked Dunne if he could purchase 75,000 shares of the WEBM IPO. Dunne accepted this offer, and then asked the offering price. Finch said the initial offering price was presently between $8 and $11 per share, but that Dunne needed to be flexible because the actual offering price would not be determined until the date of the offering. Finch said that, if Dunne were flexible as to the price, the shares were his.
They scheduled to meet for lunch on January 19.
Finch had an entirely different memory of this telephone call. He testified that Dunne simply asked if he could open an account with him, and Finch said he could. They arranged to meet for lunch on the 19th and the telephone call ended. Finch said the subject of WEBM shares was not discussed in this first telephone call.
I do not credit Dunne’s testimony regarding this first telephone call for at least two reasons. First, in Dunne’s answers to Morgan Stanley’s First Set of Interrogatories, signed under oath on May 20, 2000, just five months after this conversation, Dunne described this first telephone call far differently, “In mid-January 2000, Dunne spoke with Finch and arranged a meeting to discuss the opportunity to purchase shares in the upcoming WEBM IPO through Finch and [Morgan Stanley].” This virtually mirrors Finch’s version of this conversation. Dunne’s answer to this interrogatory indicates that the discussion regarding the purchase of 75,000 shares did not begin until the meeting in person on January 19.
Second, I do not believe that Dunne, who knew virtually nothing about WEBM and who barely knew Finch, would commit to purchase 75,000 shares in a telephone call that he estimated lasted between five and fifteen minutes. Dunne had never personally purchased shares of stock in anything approaching this amount before, so it is unlikely that he would so quickly commit himself to a purchase of this size, especially since it was doubtful that he had the financial ability by himself to make so large a commitment. It is far more likely that any such discussion would have been deferred until they met for lunch.
I credit Finch’s version of what was said, but not as to what was understood. When Finch spoke with Stephens Dunne, he understood that Dwight had spoken to Stephens about the WEBM IPO, and that Stephens was inquiring about the possibility of purchasing a large quantity of IPO shares from Finch. Finch also understood that Stephens, unlike Dwight, would not be a “prohibited person” barred from buying these “hot” IPO shares. Finally, Finch understood that Stephens was an heir to the John Deere fortune and may be an entree to obtaining accounts from other wealthy members of the Deere family. When they *550 arranged the meeting for January 19, both Finch and Dunne understood that the purpose of this meeting to discuss Dunne’s possible purchase of a large amount of WEBM IPO shares from Finch.
Finch came to Dunne’s South End apartment around noon on January 19, and they spoke there for about thirty minutes. The focus of their discussion was the WEBM IPO. Finch told Dunne about the background of WEBM, including the MIT Media Lab story that Dunne had thought was described earlier over the telephone. Finch also described how he had brought the IPO to Morgan Stanley — that he learned of WEBM from a friend who worked there, that Finch had called Merrick just before Merrick was about to choose Goldman Sachs as the lead underwriter for the IPO, that Morgan Stanley initially did not want to underwrite the IPO, and that Finch told Morgan Stanley about the new revenue stream that WEBM was about to enjoy and then Morgan Stanley wanted to proceed with the deal. Finch said that he had personally met with Merrick at WEBM’s offices in Virginia and will receive a large allocation of IPO shares to sell. He asked Dunne if he wanted to take 75,000 of those shares; Dunne said he could. Finch asked Dunne if he could handle another 75,000 shares. Dunne said he could. Finch warned Dunne that he needed to be flexible as to these additional shares, because Finch could not be sure he would get them. Finch said the offering price was already higher than predicted and, as a “hot” IPO, would likely rise from four to eight times in the after-market.
Dunne’s father had been a stockbroker and Dunne’s apartment contained many of the binders from deals that his father had handled. Finch leafed through some of these binders, noting that the dollars involved in these offerings were large in the 1960s but would not be viewed as large today. Finch said that he planned ultimately to move to New York City and into the institutional side of the business.
In a detour on their way to lunch at Zygomates, Dunne took Finch on a tour of the real estate properties in the South End that Dunne was renovating, and they walked through one of the properties that was in the midst of renovation. By the time lunch concluded, Dunne had told Finch that he was going to form with Dlugasch a limited liability company (“LLC”) to invest in the WEBM IPO, and was going to finance the investment through family members and business colleagues. They agreed to meet again soon for lunch so that Dunne could provide Finch with the LLC paperwork to open an investment account at Morgan Stanley and review where they were.
This Court’s findings as to the content of the January 19 discussions, set forth above, are an amalgam of the testimony of Dunne and Finch, adopting some of the testimony of each and rejecting some. Specifically, this Court does not credit Dunne’s testimony that Finch said he had received an allocation of 300,000 shares. Dunne may have heard this information from his brother, Dwight, but I do not believe he learned it directly from Finch because, if he had, Finch would not have said that he was unsure he would receive a sufficient allocation to support an additional 75,000 shares for Dunne. This Court also does not credit Dunne’s testimony that he twice asked Finch for a letter of intent, once at his apartment and a second time at lunch, and that Finch each time said that there was no need for such a letter, that a handshake was all that was necessary, and that he could trust him.[8]
This Court does not credit Finch’s testimony that he did not mention either the purchase of 75,000 shares or the possible purchase of another 75,000 shares. Indeed, according to Finch, he did not specifically discuss with Dunne the possibility of Dunne purchasing any shares in the WEBM IPO. Certainly, based on Dlugasch’s testimony, Dunne was discussing these numbers the next day, and it is unlikely that he made them up. Moreover, it stretches credulity that Finch would not even take a GEI from Dunne at this meeting, since its sole purpose was to discuss the upcoming WEBM IPO.
Nor does this Court credit Finch’s testimony that he was clear with Dunne that he was hopeful he would receive an allocation of shares but could not be certain that he would. This likely was what Finch told his friends, but it was not what he told the current and prospective clients he was trying to impress. To them, Finch presented himself as the stockbroker whiz kid who had been instrumental in bringing a major IPO to Morgan Stanley, who was working directly with the CEO to bring the company public, and who would be generously rewarded by both the CEO and Morgan Stanley for all that he had done for both. The cautionary note — that he was hopeful to receive an allocation but could not be certain of one — would have seemed discordant in such a story, since it would have raised the question of whether Finch was as important to this deal as he said he was. Rather, the message Finch delivered to his clients and prospective clients, including Dunne, was that he would receive a large allocation of IPO shares for all that he had done for this deal, and hoped to receive an even larger allocation.[9]
After the luncheon, Dunne telephoned Dlugasch and arranged to meet with him the next day. On January 20, 2000, Dunne met with Dlugasch at Dlugasch’s office at Waldron H. Rand & Co., P.C. (“Waldron Rand”), the accounting firm where Dlugasch was a shareholder, specializing in closely held corporations, tax matters, and business advice. At this meeting, Dunne told Dlugasch what occurred in his meeting with Finch the previous day. Dunne said that Finch had 75,000 shares, maybe 150,000 shares, in the WEBM IPO to sell to him. They promptly took steps to form the LLC that would be used as the investment vehicle to finance and hold the WEBM shares they hoped to purchase, since they understood *551 they had only two weeks before the IPO shares would be sold. They figured they needed initially to raise more than $1 million to purchase the 75,000 shares at the initial offering price, which they understood had already increased. They agreed, at Dlugasch’s suggestion, that profits in the LLC would be split 70-30: 70 percent to the investors and 30 percent to them as the managing members of the LLC. They agreed to retain the law firm of Holland & Knight LLP to do the legal work needed to form the LLC. They also agreed upon a division of labor: Dunne would raise money from family members, and Dlugasch would handle the administrative and financial duties, and raise money from his own business contacts.
Following this meeting, Dlugasch dived into the work needed to make this deal happen. Although it was approaching tax season, his busiest time of year, he devoted about half of his working hours in the latter part of January to the WEBM deal. In the first week of February, he devoted roughly 40 hours to the deal. In the second week of February, up through the IPO date of February II, working an 80 hour week, he devoted virtually all his working hours to the deal.
After his meeting with Dlugasch, Dunne spoke to family members about the WEBM IPO and the possibility of them investing in the IPO through him. Dlugasch spoke to colleagues, clients, and friends about the investment possibility. Both found many who were extremely interested in investing large sums of money in the deal.
On January 27, 2000, Dunne and Finch met again, this time at Charlies’ Restaurant in the Chestnut Hill Mall. At this luncheon, Finch told Dunne that the offering price for WEBM had gone up yet again, but the good news was that he now thought the after-market share price would be between five and eight times its initial offering price. Dunne reiterated his interest in purchasing these shares regardless of price. Dunne told Finch that he had formed an LLC as the investment vehicle to purchase the WEBM shares, and had raised more than one million dollars from family members and business associates, but was still not sure whether the name of the LLC would be Green Lake or Twin Fires, the latter being the name of his family’s summer vacation home in the Adirondack Mountains. Dunne told Finch that he initially had not planned to bring in family members, but now that his cousins were investing, he needed to invite other family members to join. Finch told Dunne that he had written Merrick and requested a special allocation of 100,000 shares; he reminded Dunne that he needed to be flexible as to any additional shares beyond the initial 75,000. They arranged to meet again for lunch on February 1 with Dlugasch to work out the logistics.
On February 1, Dunne called Finch in the morning to confirm their luncheon appointment. Finch told Dunne he could not make the meeting because he was too busy with matters involving the IPO. Finch mentioned that he needed to go to Virginia to resolve an IPO matter.[10] Finch asked to reschedule the meeting, but Dunne said he could not meet again because he was leaving on February 3 for Florida to attend a family event. Dunne asked if Finch could meet with Dlugasch, and Finch agreed. During this telephone call, Dunne asked Finch to send him the forms necessary to open an investment account for the LLC Dunne had formed, which he informed Finch was to be called Twin Fires.[11]
Finch sent Dlugasch the wrong form for Twin Fires to open an account at Morgan Stanley; he sent the form for a corporation rather than an LLC. Dlugasch called Finch to straighten out the problem, which Finch did on the morning of February 3. Dlugasch also asked Finch to e-mail him a preliminary prospectus, which Finch did on February 3, but Dlugasch could not read the attachment on his computer. Dunne met with Dlugasch on the afternoon of February 3 to sign the account opening form for Twin Fires, and then left at roughly 7:30 p.m. on an airplane for Florida. Dlugasch telephoned Finch on February 3 and arranged to see him the next morning, promising to bring the Twin Fires account form and a $100 check to invest in the new account. William Kams, a fellow shareholder of Dlugasch’s at Waldron Rand and, through his wife, an investor in Twin Fires, asked to attend the meeting with Finch, and Dlugasch agreed.[12]
Finch’s Meeting with Dlugasch and Kams
On February 4, at roughly 8:30 a.m., Dlugasch and Kams arrived at Finch’s Wellesley office. The description of this meeting varied greatly between the version recalled by Dlugasch and Kams, and Finch’s version. This Court finds Dlugasch’s and Kams’ version to be closer to the truth.
Dlugasch and Kams arrived before Finch, and waited for him in the reception area. When Finch met them, Dlugasch handed him the Twin Fires account opening form, and the check for $100; Finch did not need the $100 check and later voided it. Shortly thereafter, they went into a nearby conference room and sat down. Finch then told them the story of how he had brought the IPO to Morgan Stanley. Dlugasch and Kams then asked a series of questions about the logistics of the IPO. They asked whether Morgan Stanley took any commission on the sale of IPO shares; Finch correctly told them that there was no commission. They asked whether cash in their investment account would receive any interest, and Finch said it would. They asked about the length of the settlement period and Finch, incorrectly, told them nine days. They asked about the opening price, and Finch said it would probably be between $25 and $28 per share. They asked if Twin Fires would get 75,000 shares, and Finch said it would, with the possibility of getting a lot more. Dlugasch asked for a preliminary prospectus, and Finch provided him with a copy. Dlugasch asked *552 Finch for instructions to wire money into the Twin Fires account, and Finch said he would need to get back to him on that issue. They then discussed the possibility of referring clients to each other, and the meeting came to an end.
This meeting is of critical importance because it is the only conversation in which Finch discussed with someone other than Dunne the likelihood that Twin Fires would receive 75,000 shares from the WEBM IPO. Finch insists that Dlugasch or Kams simply asked whether he was going to receive any shares in this IPO to sell and that Finch replied that he hoped so, but would not know until the day of the deal or just before. Finch said there was never any discussion of a specific amount of shares going to Twin Fires.
I do not credit Finch’s version, for at least two reasons. First, I find both Dlugasch and Kams, despite their substantial financial stake in this litigation as major investors in Twin Fires, to be more credible witnesses than Finch. Second, given the amount of time, effort, and money that Dlugasch and Kams were investing in the purchase by Twin Fires of the WEBM IPO shares, it makes no sense that they would have been satisfied with Finch’s response, since it was far more equivocal than what they had learned from Dunne. Kams went to this meeting precisely to learn for himself what was happening, since his wife had committed to investing $150,000 in Twin Fires, and this information would have markedly chilled his fervor. The evidence, however, shows that Kams was not merely satisfied with Finch’s explanation, but was ecstatic over it. When he left the meeting, he told Dlugasch that he wanted to increase his wife’s investment to $300,000, that he was going to take a margin loan to fund the investment (which he had never done before), and that he would even lend $50,000 to Dlugasch so that he could increase his investment. Kams spoke with his brother-in-law, Steven Weinstein, following the meeting and confirmed that 75,000 shares would be available to Twin Fires and possibly more. As a result of this conversation, Weinstein committed to invest $75,000 towards the purchase of the 75,000 shares, and another $75,000 if more shares came available. Kams, a rather somber gentleman who hardly appears to be a man prone to ecstasy, would not have increased his investment by this amount and said what he did to his brother-in-law if Finch had been as equivocal as he testified.
The preliminary prospectus that Finch gave to Dlugasch on February 4 had been issued on January 24,2000 and contained on its first page, vertically and in red, the following declaration:
The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and we are not soliciting offers to buy these securities in any state where the offer or sale is not permitted.
Dlugasch reviewed the prospectus for roughly an hour after the meeting, but did not read this declaration carefully or consider whether or not the registration statement had become effective.
The Days Before the Commencement of Public Trading in the WEBM IPO
On Tuesday, February 8, Finch prepared the internal Morgan Stanley form needed to open a Twin Fires account, with a designated account number. This form was not reviewed by the branch compliance manager, Andra Sheinkopf, until February 9, so no account number was generated until then. As a result, when Finch first sent wire instructions to Dlugasch, the account number was not correct, and the wires sent on February 8 had to be retained in a suspense account until the correct account was opened on February 9. Finch later sent wire instructions with the correct account number.
Beginning on February 8, multiple wire transfers were sent to Morgan Stanley by Twin Fires’ investors for deposit into the Twin Fires account. Because of the confusion over the account number, the wire transfers did not find their way into the Twin Fires account until February 9. On February 10, one day before the IPO was to commence, Finch confirmed in a telephone call with Dlugasch that roughly $1.5 million had been deposited into the Twin Fires account, and Dlugasch told Finch that more money was in transit. Through the computer at his desk, Finch had access to the amount of funds in each of his clients’ accounts at Morgan Stanley, including Twin Fires, so he was able to monitor the growth in that account as funds were wired to it.
During this period, as a result of conversations that Dunne was having in Florida with family members and that Dlugasch was having in Massachusetts with colleagues, friends, and clients, Twin Fires obtained sufficient funds to purchase 75,000 WEBM IPO shares, and was in a position quickly to obtain additional funds to finance the purchase of additional shares if they became available. While in Florida, Dunne continued to telephone Finch to ask about changes in the initial offering price, to learn whether Finch had any news about the additional shares, and to reiterate his interest in obtaining as many shares as he could get. Finch told him that the share price was rising and that he still did not know anything more about additional shares.[13]
Finch believed that Morgan Stanley would allocate shares in the IPO among its retail branches and institutional investors on February 10, because some time was needed before public trading began for Morgan Stanley’s branches to allocate shares among the brokers within the branch and for brokers to confirm with their customers that they wished to purchase the IPO shares. To understand Finch’s state of mind as *553 February 10 approached, it is necessary to understand more about how IPO shares were sold at Morgan Stanley during this time period. After the “pre-effective registration” of an IPO and during the “quiet period,” a broker was permitted only to solicit GEIs regarding the purchase of IPO shares. During this “quiet period,” he could not promise to sell such shares, accept payment for such shares, or confirm any such sale. When an announcement was made that the final prospectus was to be issued (establishing the actual initial offering price) and the registration was to become effective, Morgan Stanley allocated the IPO shares among its branches, and the branches allocated their shares among their brokers. Each broker then allocated shares among his clients who had earlier given a GEI. The broker had to telephone each client designated to receive shares to confirm that the client wished to purchase the amount of shares made available to that client at the actual initial offering price.
Morgan Stanley’s Compliance Guide recognized the danger that a client may be confused as to the meaning of a GEI, especially in a “hot” IPO:
In obtaining GEIs, Financial Advisors should be careful not to use any terminology in discussions with clients which could be construed as an assurance, or even indicating the likelihood, that a specific number of shares will be allocated. It must be absolutely clear that allocations are subject to change or even cancellation until the offering becomes effective (the date of the final prospectus). Ordinaiy “sales talk” can be easily misinterpreted, especially if an issue is in heavy demand and a client is anxious to obtain shares.
Morgan Stanley’s Compliance Guide, “Syndicate Offerings,” at 4.
Before the registration became effective, a Morgan Stanley broker was required to submit his GEIs to the Syndicate Coordinator within his branch, who was then to pass on the totals to the Syndicate Desk at headquarters in New York. The theoretical purpose in providing aggregate data regarding the GEIs was to assist the investment brokers in evaluating the demand for IPO shares, which was helpful in advising as to the initial offering price, and to ensure that a branch was not allocated more shares than needed to fill its GEIs. In reality, it accomplished virtually no purpose because Morgan Stanley did not bar its brokers from taking GEIs from retail clients that exceeded the amount of shares Morgan Stanley would sell them— 1,000 shares for “hot” IPOs and 2,000 shares for all other IPOs. Therefore, Morgan Stanley had no policy that prevented a broker from taking a GEI of 75,000 shares from a retail customer on a “hot” IPO even though Morgan Stanley policy barred selling that customer more than 1,000 shares.[14]
In Finch’s mind, he was simply soliciting a GEI from Dunne, much as he had solicited GEIs in other IPOs that had taken place earlier during his short stint at Morgan Stanley. In those IPOs, too, he had solicited GEIs beyond any realistic possibility that his allocation would allow him to sell shares in that amount. When the expected had happened and his allocation was far too small to permit him to sell the amounts offered in the GEIs, he had simply explained to his clients that his allocation had fallen short. In Finch’s mind, if the special allocation did not come through or proved to be too low to meet the amounts in his clients’ GEIs, he would offer the same explanation.
The difference, of course, was that, in the WEBM IPO, he had puffed up his importance to his clients and led them to believe that he was going to receive so large a special allocation that he would be able to sell large quantities of IPO shares to them. In 1999, Finch expected that he would receive a large special allocation from Merrick, perhaps even an allocation as large as the 250,000 — 300,000 shares that Keller had told him he was promised by the CEO before his IPO collapsed. By January 5, 2000, however, when he wrote to Merrick asking for up to 100,000 shares, he could not reasonably have expected that he would receive more than 100,000 shares, and he needed more than that to meet what he said he could deliver to Dunne, Hall, LeFave, and Sekel alone. As each day passed without any response from Merrick to this letter, his expectation both as to the likelihood that he would receive a special allocation and the likely amount of any such allocation had to diminish. There appears to have been, however, a “disconnect” between this adjustment in his expectations and his boastful sales pitch, which remained essentially unchanged with Dunne, Dlugasch, and Kams in January and early February 2000 from the sales pitch he had given in Texas to Hall, LeFave, and Sekel in 1999. He somehow still believed he could parlay his success in bringing the WEBM IPO to Morgan Stanley to propel him into the top echelon of brokers, and, as long as he thought he still had a chance to obtain a special allocation from Merrick, he seemed willing to postpone thinking about what he would do with these unhappy clients if the special allocation never came.
To be sure, as February 10 approached, Finch still believed there was a possibility that he would receive a large special allocation. While he would puff up his importance (and his probability of obtaining a special allocation) to his clients, he did not do so with his friends (at least to the same degree). Therefore, this Court views the e-mail Finch sent to Esposito, his friend and former mentor, at 2:35 p.m. on February 8, 2000 as best reflecting Finch’s actual state of mind at that time. Esposito, in an e-mail sent at 2:19 p.m. that day, had told Finch that he had established two separate investment accounts. He wrote, “dude, you gotta get me atleast [sic] 10,000 shs for each, i’m [sic] counting on it.” Finch e-mailed back just fourteen minutes later:
*554 Chris, you know I can’t promise something like that. I don’t know hów much I’m getting and won’t know until either tomorrow afternoon or Thursday morning. You know I’m going to get you as much as I can but I don’t know what that’s going to be. It may be 10,000, it may be 500 I have NO idea. I’ve asked for a ton and the guy said he would get some for me but other than that I can only guestimate. It’s possible that anything can happen. I am crossing my fingers, toes, eyes, legs and arms. Also knocking on the closest piece of wood. I suggest you do the same.
From this e-mail, this Court infers that, as of the afternoon of February 8, Finch still believed there was a meaningful possibility that he would receive a large special allocation from Merrick, large enough perhaps to allow Finch to allocate as many as 10,000 shares to Esposito.
On February 10, Dunne called Finch twice to ask him again if he knew more about the additional shares or the actual initial offering price. Finch was busy calling up sixty of the WEBM employees in the Directed Shares Program to confirm that they wanted to purchase the 800 shares that would certainly be available to each of them, and to learn whether they wanted to purchase any additional shares if any became available. [15] Finch told him that the price had not been set, that he knew nothing more as to the allocation, and that he would know more later in the day.
At roughly 6:30 p.m. on February 10, the WEBM IPO registration statement became effective, the initial offering price had been set at $35 per share, and public trading was scheduled to begin the next day. Finch had learned from Caswell earlier in the day that Finch’s allocation of WEBM shares from the branch was only 225 shares. He had heard nothing about any special allocation.
Dunne went to a play that evening and, after it ended, he telephoned Finch. Finch told Dunne that the WEBM IPO had been priced at $35 per share. When Dunne asked him if he knew anything more about share allocation, Finch said he did not and would learn the next day. Dunne, believing this referred to the allocation beyond the 75,000 shares he expected, was not alarmed by this statement. Dunne asked' Finch how much money had reached the Twin Fires account, and Finch gave him his best memory. They agreed to speak the next morning.[16]
February 11, 2000: The Commencement of Public Trading in WEBM IPO Shares
Dunne awoke on February 11 believing that it would prove to be a momentous day for him. He began the day by driving to Roxbury to visit his late father’s grave; he testified that he wished that his father were alive to enjoy the day with him. He then drove to Dlugasch’s office at Waldron Rand to join Dlugasch, Kams, and many other Twin Fires investors to celebrate the beginning of public trading and execute the exit strategy that he and Dlugasch had devised.[17]
Finch’s day began quite differently on February 11. He arrived at Morgan Stanley at around 7:30 a.m., knowing that, if he had received a special allocation from Merrick, news of it would arrive early before public trading began. By roughly 9 a.m. that day, he recognized from the silence that Merrick had not delivered any special allocation to him. At 9:02 a.m., he wrote two e-mails to friends who had hoped to obtain shares in the IPO. He wrote Keane, “It is going to suck big-time today.” He wrote another friend, “I got screwed. Sony bro. I’m not having a good day. ” Among the many reasons why Finch knew this was going to be a bad day was that he needed somehow to tell Dunne that Twin Fires was not going to receive any shares in the IPO.
It appears that Finch decided to postpone giving this awful news to Dunne until public trading began and any remote possibility of a special allocation being given to Finch had expired. It also appears that Finch decided that, when he ultimately had to give the bad news to Dunne, he would blame Merrick for having misled him.
Dunne called Finch around 10:40 a.m. that morning from Dlugasch’s office, in anticipation of the beginning of public trading, which was scheduled to open at 11 a.m. Finch told him that the opening of trading had been delayed by a question of share allocation involving Goldman Sachs. Dunne asked whether that problem posed any threat to Twin Fires’ 75,000 shares, and Finch said it did not. Finch said that public trading had simply been postponed until 2 p.m.
As Dunne and Dlugasch waited for the commencement of public trading, they re-examined the amounts furnished by their investors to make sure they had the $2.625 million needed to purchase the 75,000 shares they were expecting at $35 per share. They also determined how they would allocate among their investors the additional 75,000 shares if those came through. Around 1 p.m., they learned from a Twin Fires investor who was monitoring stock trading on the Internet that public trading in WEBM had begun and that it was already trading at $200 per share.
Dunne telephoned Morgan Stanley around 1:10 p.m. and attempted to reach Finch. Whoever answered the telephone told Dunne that Finch was very busy. Dunne became angry and said, “What do you mean he is busy? I have 75,000 shares.” Finch then answered the call, congratulated Dunne, and told him that the price was now $205 per share. Dunne put his hand over the receiver, told Dlugasch that they were in at $205, and suggested that they immediately sell 30,000 shares. Dlugasch agreed. Dunne then told Finch to sell 30,000 shares at “market — $205.” Finch asked whether he wanted to wait until he learned about the additional allocation, but Dunne said he wanted to *555 lock in the profit. Finch, trying to buy time to figure out what to say to Dunne, said he would call Dunne back in ten minutes with news about the additional allocation. When Dunne hung up the telephone, he was so happy about the money he had made for him and his family that he did a “victory dance” around Dlugasch’s office.
The ten minutes that Finch had spoken of came and passed without a telephone call. Dunne waited in vain for roughly seventy minutes, and then decided to call Finch himself. When he reached Finch, he asked him why he had not gotten back to him. Dlugasch and the others in his office watched as Dunne’s face fell while Finch explained to him that there might be a problem with Twin Fires’ shares in the WEBM IPO. Finch said he was checking to see if Merrick had written a letter authorizing the special allocation of shares to Finch. He said that “Merrick may have screwed him.” Dunne asked Finch what the market price was and when he was told that it was $211, he instructed Finch to sell the remaining 45,000 shares at $211. Finch told him that he had no shares. This time he added that he had spoken to Merrick and learned directly from him that Merrick had not authorized a special allocation of shares to him.
This Court does not credit Finch’s version of what was said that day. According to Finch, he received three telephone calls from Dunne after trading began. In the first, he told Dunne that he had not gotten his special allocation, and Dunne began this strange diatribe about having an informant at Morgan Stanley who knew that Finch had shares in a house account. Finch said that Dunne called back shortly thereafter and told him to sell 30,000 shares. Finch claims he told Dunne that there were no shares to sell, and he could not sell what he did not have. Dunne supposedly responded that CEO Merrick had sent a letter to Morgan Stanley saying that 75,000 shares of WEBM had been set aside for Dunne, and that Finch needed to get in touch with that person in order to get those shares into Dunne’s account. In the third telephone call, Finch recalled that Dunne told him he wanted to sell 45,000 shares from his account. Finch told him that he had no idea what Dunne was talking about because there were no shares to sell. Dunne kept insisting that there was a letter from Merrick, so Finch finally lied to him about having spoken with Merrick that afternoon. According to Finch, Dunne was not “acting like a rational person.”
There are three reasons why I do not credit Finch’s version. First, Dlugasch was in the room when Dunne spoke with Finch, and would have heard Dunne’s strange response. He testified that he did not hear Dunne say anything about an informant or a letter from Merrick. Second, Dunne may have been giddy at the prospect of having so quickly earned so much money, but he was rational enough for all to observe his face to have fallen when he heard Finch tell him that the shares were not there. This Court does not believe that Dunne would have danced around the office if, as Finch testified, Finch had told him before Dunne tried to sell the 30,000 shares that there were no shares to sell. Third, both Finch and Dunne agree that Dunne tried to sell 30,000 shares and then 45,000 shares, and that Finch lied about having spoken directly with Merrick about the absence of a special allocation. This Court’s findings as to what transpired more reasonably explains how those three statements were made than Finch’s explanation.
Shortly after this exchange of telephone calls with Finch, Dunne telephoned the Wellesley office and tried to reach Caswell, the branch manager. He was instead transferred to Sheinkopf, the branch’s compliance manager, and demanded that she rectify the situation and honor what he characterized as Morgan Stanley’s commitment to sell 75,000 shares. Subsequently, more angry telephone calls were made, more demand letters were sent, and this litigation commenced.
Conclusions of Law
The plaintiffs have alleged eleven counts in their complaint but, stripped to their essence, there are only four legal theories that may warrant an award of damages:
Breach of contract or promissory estoppel;
Intentional or negligent misrepresentation;
Violation of the Massachusetts Blue Sky Law, c. 110A; and
Violation of G.L.c. 93A.
Each legal theory presents different legal issues, so this Court will consider each in turn.
Breach of Contract or Promissory Estoppel
The plaintiffs contend that they entered into an enforceable oral contract with Morgan Stanley, through Finch, its agent, whereby Morgan Stanley promised to sell 75,000 shares of WEBM IPO shares and Twin Fires agreed to purchase them. Since Morgan Stanley failed to deliver those shares despite Twin Fires’ demand and readiness to pay, Twin Fires contends that Morgan Stanley breached that contract and must pay the traditional measure of contract damages — the benefit of the bargain that they had entered into. Stated differently, Twin Fires contends that, in view of Morgan Stanley’s breach of this alleged contract, Twin Fires should be placed in the same position it would have been in had there been no breach, which would mean that Twin Fires would be awarded damages equal to the net profit it would have reaped had it purchased the 75,000 WEBM shares on February 11 and sold them as Dunne directed later that afternoon — $ 12, ■487,940.
Certainly, oral agreements, including oral agreements to sell securities, may be legally enforceable. See generally ESO, Inc. v. Kasparian, 32 Mass.App.Ct. 731, 733-34 (1992) (“an agreement need not be in *556 writing in order to be enforceable”); George v. Coolidge Bank & Trust Co., 360 Mass. 635, 641 (1971). Morgan Stanley, however, contends that this alleged agreement cannot be enforceable because it lacked valid consideration. Morgan Stanley correctly observes that, under Section 5 of the Securities Act of 1933, 15 U.S.C. §77e(c), it is unlawful for any person, directly or indirectly, to sell a security before the registration statement has become effective. Morgan Stanley also correctly observes that, during the “quiet period” before the registration statement becomes effective, offers to sell the securities are permitted, as are offers to buy, but any offer of an investor to buy may be cancelled by the investor without penalty. See Offers and Sales of Securities by Underwriters and Dealers, S.E.C. Release No. 4697, 1964 WL 68261 (May 28, 1964); A.C. Frost & Co. v. Coeur D’Alene Mines, 312 U.S. 38 (1941). Since Twin Fires was permitted to cancel its offer to buy at any time before the registration statement became effective at roughly 6:30 p.m. on February 10, 2000, Morgan Stanley argues that any agreement prior to this date and time lacked mutuality of consideration and therefore was unenforceable as a matter of law.
This Court does not adopt this argument. There is certainly nothing in federal law that requires this result. The Supreme Court in A.C. Frost & Co. made clear that the purpose of the Securities Act of 1933 was to protect the investment public. Id. at 43-44 & n. 2. There are two reasons why the law permits an investor to cancel any offer to buy before the registration statement becomes effective. First, Congress wanted “investors to become acquainted with the information contained in the registration statement and to arrive at an unhurried decision concerning the merits of the securities.” Offers and Sales of Securities by Underwriters and Dealers, S.E.C. Release No. 4697, 1964 WL 68261 (May 28, 1964). Second, until it becomes effective and the final prospectus is issued, the precise terms of the offer to sell, including the price, are subject to change. See id. There is nothing about Section 5 of the Securities Act of 1933 or its interpretation by the SEC that suggests that securities dealers were intended to be protected from improvident offers to sell during the “quiet period.” Indeed, in A.C. Frost & Co., the United States Supreme Court enforced against an issuing company an offer to sell that it had made without proper registration. A.C. Frost & Co. at 43-44 & n. 2. See also A.D.M. Corp. v. Thomson, 707 F.2d 25 (1st Cir. 1983).
While there are Massachusetts cases that state that mutuality of obligation is a prerequisite to a binding contract, see, e.g., Bernstein v. W.B. Mfg. Co., 238 Mass. 589, 591 (1921), the fact remains that Massachusetts law does not require mutuality of obligation when the law grants one party to a contract the right to declare it void. See Atwell v. Jenkins, 163 Mass. 362, 364 (1895) (voidable promise can constitute adequate consideration); Rothberg v. Schmiedeskamp, 334 Mass. 172, 175 (1956). Just as the Securities Act of 1933 seeks to protect investors before the registration statement becomes effective by granting them the right to void a promise to purchase securities, the common law seeks to protect minors “from their own improvidence and want of sound judgment” by granting them the right to void a contract. Frye v. Yasi, 327 Mass. 724, 728 (1951). The right of a minor to void a contract does not mean that the contract cannot be enforced by the minor against the adult. “ ‘Voidable’ imports a valid act which may be avoided, rather than an invalid act which may be confirmed (Williston on Contracts [Rev. ed.] §231), and the contract of a minor is valid as to both parties until rescinded.” Rothberg v. Schmiedeskamp, 334 Mass. at 176. Consequently, the fact that Twin Fires could cancel any promise to buy before the registration statement became effective does not render unenforceable any promise that Morgan Stanley may have made to sell securities during this “quiet period.”
This Court, however, for a wholly different reason, does not find that Twin Fires and Morgan Stanley entered into an enforceable contract regarding the sale of the 75,000 WEBM IPO shares. The sale of IPO securities, as demonstrated here, is far different from a routine sale of securities in a publicly-traded stock. In a routine securities transaction, the investor offers to buy publicly-traded shares either at the market price or when the price drops to a limit price, and the securities dealer agrees to sell shares to the investor in accordance with those instructions. While the investor may choose to deal with a particular stockbroker in the employ of that securities dealer, the investor recognizes that any stockbroker could cany out this trade. Such a routine transaction involves no conditions precedent. Here, however, Dunne and Dlugasch (and indeed all the investors in Twin Fires) recognized that they were going to be able to purchase WEBM IPO shares only because they had found a stockbroker who had brought the IPO to Morgan Stanley and therefore was going to receive a large special allocation of shares to sell. They knew that they could not obtain 75,000 IPO shares in WEBM by simply walking into Morgan Stanley’s Wellesley branch, opening an investment account in the name of Twin Fires, asking for a random broker, and directing that broker to purchase 75,000 shares of WEBM at the initial offering price. Consequently, central to the agreement between Dunne and Finch, and implicit in that agreement, were two conditions precedent that all parties understood had to occur before any right or obligation could mature under the contract:
The IPO had to proceed to fruition with the sale of the IPO shares; and
Finch had to receive an allocation of shares at least as large as the amount he had said he would obtain for Twin Fires.
For all practical purposes, if either of these conditions were not met, consummation of the contract *557 would become impossible. If the IPO fell through, Finch could not be expected to deliver WEBM shares to Twin Fires because there would be no shares to sell. Similarly, if the allocation to Finch fell through, he could not be expected to deliver WEBM shares to Twin Fires because he would have no shares to sell. It is true that Morgan Stanley, as the lead underwriter, had WEBM shares to sell even if Finch did not, but the essence of this deal was always personal to Finch; these shares were only going to be available to Twin Fires because they were going to be available to Finch. The fact that Finch misrepresented the likelihood that this condition precedent would be satisfied does not change the fact that their agreement contained this implicit condition precedent, and that this condition precedent did not happen.[18]
Since this Court finds that the receipt by Finch of a special allocation of at least 75,000 WEBM shares was a condition precedent to any agreement to sell Twin Fires these shares, it does not matter whether the contract claim is characterized as a breach of contract or as a claim of promissoiy estoppel premised on reliance. Certainly, reasonable reliance may render a promise enforceable as a contract to the extent needed to avoid injustice, see Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 760-61 (1978), but reliance may not create an enforceable contract when a condition precedent has not been satisfied. See City of Haverhill v. George Brox, Inc., 47 Mass. App. at 721 (“estoppel or reliance presumes the existence of a contract”). Therefore, this Court finds in favor of the defendants on the plaintiffs’ claims of breach of contract and promissoiy estoppel.
Intentional or Negligent Misrepresentation
While the condition precedent of a special allocation to Finch defeats any claim based in contract, it does not defeat a claim based on either an intentional or negligent misrepresentation. Here, the plaintiffs allege that Finch materially misrepresented the likelihood that he would receive a special allocation large enough to provide Twin Fires with 75,000 WEBM shares by telling Dunne, Dlugasch, and Kams that he would receive the special allocation when he knew, or reasonably should have known, that he had only a possibility (and, indeed, a remote possibility) of obtaining so large an allocation. The plaintiffs contend that this misrepresentation was intentional and that they are entitled to “benefit of the bargain” damages as a result of this intentional misrepresentation, that is, the same amount of damages they would have obtained had their breach of contract claim prevailed.
To prevail on a claim of intentional misrepresentation, sometimes referred to as a claim of fraudulent misrepresentation or deceit, “the plaintiff must prove ‘that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.’ ” Danca v. Taunton Savings Bank, 385 Mass. 1, 8 (1982), quoting Barrett Assocs. v. Aronson, 346 Mass. 150, 152 (1963), quoting from Kilroy v. Barron, 326 Mass. 464, 465 (1950). When the false representation was not made with knowledge of its falsity but the defendant “failed to exercise reasonable care or competence in obtaining or communicating the information,” a plaintiff may prevail on a claim of negligent misrepresentation. Golber v. BayBank Valley Trust Co., 46 Mass.App.Ct. 256, 257 (1999), quoting Fox v. F&J Gattozzi Corp., 41 Mass.App.Ct. 581, 587-88 (1996).
Morgan Stanley contends that, even if Finch had made a misrepresentation, that misrepresentation is not actionable because neither Dunne nor Twin Fires acted reasonably in relying on the misrepresentation. See, e.g., Golber, 46 Mass.App.Ct. at. 257 (reliance must be justifiable). Morgan Stanley argues that the plaintiffs knew or should have known from the declaration written in red on the preliminary prospectus that WEBM shares could not be sold until the registration statement became effective. This Court finds nothing in that declaration that reasonably should have prevented Twin Fires and Dunne from relying on Finch’s statements regarding his receipt of a special allocation. As noted earlier, that declaration read:
The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and we are not soliciting offers to buy these securities in any state where the offer or sale is not permitted.
From the second sentence in this declaration, a reader reasonably should understand that the actual sale of WEBM securities could not occur until the registration statement became effective; he would not know when that is to happen or whether it had already happened, and he would see nothing to bar a promise to sell shares provided the sale occurs after the registration statement becomes effective. From the third sentence, a reasonable reader should understand that WEBM is not yet offering to sell shares and is not soliciting offers to buy in those states where this is prohibited; he would not know if Massachusetts is one of those states.[19] In short, there is nothing in this declaration that, even if carefully reviewed, would reasonably inform anyone that Finch could not promise to sell WEBM IPO shares prior to the effective date of the registration statement as long as the actual sale occurred after the effective date.[20]
Morgan Stanley also contends that no claim of misrepresentation may prevail here because Finch’s alleged misrepresentation was not one of fact. “A statement on which liability for misrepresentation may be based must be one of fact, not of expectation, estimate, opinion, or judgment.” Zimmerman v. Kent, *558 31 Mass.App.Ct. 72, 79 (1991). “A fact is something ‘susceptible of knowledge.’ ” Id. Here, this Court finds that Finch knowingly misrepresented to Dunne, Dlugasch, and Kams the likelihood that he would obtain a special allocation by telling them that he would receive an allocation large enough to permit him to sell 75,000 shares to Twin Fires, when he knew (and reasonably should have known) that he had only a slim chance of receiving that large an allocation from Merrick. For all practical purposes, Finch communicated to Dunne, Dlugasch, and Kams by his words that he had been assured, either by Morgan Stanley or Merrick, that he would receive an allocation of at least 75,000 shares and that there remained the possibility, of even a larger allocation. His repeated emphasis to them that there was only a possibility that he could get them more than 75,000 shares encouraged them to believe that he had been assured an allocation at least this large but had only a possibility of a greater allocation. To be sure, Finch still retained the hope until 9 a.m. on February 11 that his special allocation from Merrick would still come through but, by the time he first spoke with Dunne about the WEBM IPO on January 17, he knew that it was not certain that he would receive a special allocation from Merrick and that it was unlikely that Merrick would give him the 100,000 shares he had asked for in his January 5 letter. Indeed, at trial, Finch was asked by his own attorney:
Let me focus on the part of the sentence where you indicate, again, I’ll quote, thatyou “would obviously have no trouble allocating up to 100,000 shares of webMethods.” In writing that to Mr. Merrick, did you expect to receive that many shares from him?
No, not at all.
Why did you ask for that many shares?
I think I wanted to show him my interest level, and also I picked a number that anything obviously underneath that would be great.
Transcript at 764.
Consequently, Finch’s misrepresentations were effectively misrepresentations of fact because, by telling the principals of Twin Fires that he could get them 75,000 shares, he essentially was misrepresenting to them that he had received assurance of an allocation at least that large when he knew he had received no such assurance. However, Finch’s statements would still be actionable misrepresentations even if they were deemed representations as to future events, that is, representations regarding the likelihood that Finch would receive a special allocation for the February 11 IPO. “Although as a general rule representations as to future events are not actionable ... an exception has been recognized ‘where the parties to the transaction are not on equal footing but where one has or is in a position where he should have superior knowledge concerning the matters to which the misrepresentations relate.’ ” Cellucci v. Sun Oil Co., 2 Mass.App.Ct. 722, 730 (1974), quoting Williston, Contracts, §1496, at 373-374 (3d ed. 1970). See also Gopen v. American Supply Co., 10 Mass.App.Ct. 342, 345 (1980) (same).
The facts in Celiucci bear closely on the instant case. There, the Appeals Court noted:
The factual misrepresentations are found (1) in his repeated assurances that the deal was, in his words, “all set,” which we interpret as a prediction that Sunoco would accept the plaintiffs solicited offer; and (2) in his representations that the decision whether to accept the plaintiffs offer was to be made at the district and regional levels, where in fact approval was obtained, and that the signature by a vice president at the home office was a purely formal or perfunctory matter. In view of Patterson’s own testimony, no contention is or could be made that these statements, if made, were not fraudulent in nature. Patterson’s sole contention was that he did not make the statements, and the judge found to the contrary.
Cellucci, 2 Mass.App.Ct. at 729-30. The Court added:
[A] prediction that Sunoco will sign a contract is not like a prediction as to the weather. It lies within the entire and exclusive control of Sunoco. Representations regarding the internal processes of Sunoco and the likelihood of its acceptance did not exceed any apparent limitations on Patterson’s authority. Sunoco is liable for the fraudulent representations of Patterson in doing the business which Sunoco entrusted to him.
Id. at 730. Here, Finch had knowledge far superior to Twin Fires as to whether he would obtain a special allocation since, he, not Dunne or Dlugasch, was in a position to communicate with the persons responsible for share allocation at Morgan Stanley and with Merrick. Moreover, a prediction as to share allocation was “not like a prediction as to the weather.” It was knowable through communication with Merrick and the appropriate officers at Morgan Stanley.
Having found that the misrepresentations made by Finch were one of fact, this Court concludes that the plaintiffs have proven by a preponderance of the evidence that Finch (and, vicariously, Morgan Stanley) committed the tort of intentional misrepresentation. Finch made a false representation as to the likelihood of his obtaining a large allocation of WEBM shares; Finch knew his representation to be false; this fact was material to Dunne and Twin Fires; they reasonably relied on this representation to their detriment by organizing Twin Fires and obtaining more than $2.6 million in financing to purchase the anticipated 75,000 WEBM IPO shares; and Finch reasonably knew or should have known that his representations would be likely to induce reliance.
Having found that Finch committed the tort of intentional misrepresentation, this Court must determine the appropriate remedy. “The general rule on *559 damages in cases ... of intentional (versus negligent) misrepresentation is that the plaintiff is entitled to the benefit of his bargain or ‘the difference between the value of what he has received and the actual value of what he would have received if the representations had been true.’ ” GTE Prods. Corp. v. Broadway Elec. Supply Co., 42 Mass.App.Ct. 293, 296 (1997), quoting Rice v. Price, 340 Mass. 502, 507 (1960). See also Danca v. Taunton Savs. Bank, 385 Mass. at 8 (1982) (stating that Rice “approved the ‘benefit of the bargain’ rule as the measure of damages in ‘appropriate’ actions based upon deceit, i.e., fraudulent misrepresentation”); Restatement (Second) of Torts §549(2) (1977). In contrast, the measure of damages in a negligent misrepresentation action is out-of-pocket damages, or reliance damages, not benefit of the bargain damages. Danca, 385 Mass. at 9; Anzalone v. Strand, 14 Mass.App.Ct. 45, 49 (1982); Restatement (Second) of Torts §552B(1) (1977).
While benefit of the bargain is plainly the “general rule” of damages in cases of intentional misrepresentation, the Supreme Judicial Court in Rice stated that “(t]he benefit of the bargain rule has not been rigidly followed in this Commonwealth, and this court has suggested that the rule may be modified or supplemented to prevent injustice.” 340 Mass. at 509 and cases cited therein. This Court, in the interests of justice, shall not apply the general rule of benefit of the bargain damages to this intentional misrepresentation, but shall instead award damages only for the economic loss that Twin Fires suffered through its reasonable reliance on Finch’s representations.
This Court has four reasons for departing here from the general rule in the interests of justice. First, the benefit of the bargain rule is not an inflexible rule that means that eveiy victim of a fraudulent misrepresentation receives the benefit of what he was promised. It simply affords a recovery on a claim for deceit closely resembling that on a claim for breach of contract. Rice v. Price, 340 Mass. at 507. Section 549 in the Restatement (Second) of Torts, entitled “Measure of Damages for Fraudulent Misrepresentation,” accurately describes the measure of damages under Massachusetts law;
The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including:
the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
pecuniary loss suffered otherwise as a consequence of the recipient’s reliance upon the misrepresentation.
The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.
Restatement (Second) of Torts, §549. See GTE Prods. Corp. v. Broadway Elec. Supply Co., 42 Mass.App.Ct. at 296 (citing Restatement (Second) of Torts, §549). See also Restatement (Second) of Torts, §549, Reporters Notes (1981) (observing that Massachusetts supports the position taken by §549). Here, where the IPO securities transaction never took place, the damages under subsection (1) would be limited to reliance damages. Under subsection (2), Twin Fires would receive the benefit of their contract with the makers of the fraudulent misrepresentations — Finch and, vicariously, Morgan Stanley. See Rice v. Price, 340 Mass. at 507. However, this Court has already found that Twin Fires is not entitled to recovery under a breach of contract theory because of the failure of the condition precedent — the allocation of 75,000 WEBM IPO shares to Finch. Twin Fires cannot recover the benefit of the bargain in tort when it cannot recover that benefit in contract.
In other words, when Finch fraudulently misrepresents that he will obtain 75,000 WEBM shares for Twin Fires, and this representation is too good to be true, and the allocation of at least this amount of shares to Finch was a condition precedent of Finch’s agreement to sell shares, this Court will not make that representation become true by awarding Twin Fires the net profit from such a sale when the failure of the condition precedent prevented that agreement from becoming legally binding. The equitable purposes of the benefit of the bargain rule are to prevent the defendant from being unjustly enriched by his fraud and to give the victim what he was entitled to as a matter of contract, not to give a gullible victim a windfall by enforcing an otherwise unenforceable agreement that proved too good to be true. See Restatement (Second) of Torts, §549, Comments (g), (h), and (i); GTE Prods. Corp. v. Broadway Elec. Supply Co., 42 Mass.App.Ct. at 296-97 (giving plaintiff the benefit of the bargain where to do otherwise would allow the defendant to keep some benefits of his fraud).
Indeed, the Restatement observes that the victim of a fraudulent misrepresentation may choose to rescind the transaction induced by the false statement but, if he makes that choice, he is limited to reliance damages and cannot also seek to recover “the difference of the value between the thing received and the price paid for it.” Restatement (Second) ofTorts, §549, Comment (e). Here, the WEBM securities transaction was never consummated so it could not be rescinded, but it stands in the same posture as if rescinded, i.e. it never happened. Since Twin Fires would be limited to reliance damages if it had purchased the 75,000 WEBM shares and, for some reason, chose to rescind the transaction based on Finch’s misrepresentation, it must be limited to reliance damages when the transaction never occurred.
*560 Second, this Court frankly worries about a judicial precedent that permits an investor to obtain benefit of the bargain damages based on this type of misrepresentation. No party has cited any instance in which such damages have ever been awarded to a prospective investor who was shut out of an IPO, and this Court is reluctant to be the first. The normal practice in an IPO is for a broker to take GEIs from prospective investors during the “quiet period.” While, as noted in the Morgan Stanley Compliance Guide, the appropriate procedure is for the broker simply to learn from his clients whether they are interested in purchasing IPO shares if any become available and, if so, how many, it is easy for such conversations to venture into predictions as to the likelihood that a broker will receive a sufficient allocation and commitments to sell shares to favored customers if the allocation proves sufficient. As here, the difference between a misrepresentation and the expression of a hope may be a matter of a few words, as may the difference between a commitment to sell and a commitment to be fair. Substantial economic loss from reliance on such statements would be unusual, but every investor shut out of a “hot” IPO would be able to claim benefit of the bargain damages. The United States Supreme Court concluded that § 10(b) of the Securities and Exchange Act of 1934 did not protect “a person who did not actually buy securities, but who might have done so had the seller told the truth” in part because of its concern “about ‘the abuse potential and proof problems inherent in suits by investors who neither bought nor sold, but asserted they would have traded absent fraudulent conduct by others.’ ” The Wharf (Holdings) Limited v. United International Holdings, Inc., 532 U.S. 588, 594-95 (2001), quoting United States v. O’Hagan, 521 U.S. 642, 664 (1997). The common law of fraudulent misrepresentation does protect potential buyers of securities, but the measure of damages established under the common law for the commission of that tort needs to be respectful of the same pragmatic concern.
Third, even under the general rule, benefit of the bargain is the measure of damages for intentional misrepresentation only when they are “proved with reasonable certainty.” GTE Prods. Corp. v. Broadway Elec. Supply Co., 42 Mass.App.Ct. at 296, quoting Rice v. Price, 340 Mass. at 510. Here, benefit of the bargain damages have been proven with reasonable certainty only because Dunne issued sales orders for shares Twin Fires never owned. That bizarre circumstance is not likely to happen very often. It will happen far more often that the potential buyer will claim that he would have purchased IPO shares if not for the fraudulent misrepresentation, but there will be no evidence as to when he would have sold those shares. Since the recent bust in the stock market has demonstrated that the net profits that constitute the benefit of the bargain will depend a great deal on whether the prospective buyer would have held his shares or sold them, and on when he would have sold them, it will usually be difficult to ascertain with certainly what benefit of the bargain damages would be in this type of case.
Fourth, looking at this case with even a modicum of perspective, it is plain that Twin Fires is a victim here only to the extent that it suffered reliance damages; it has no equitable entitlement to the 75,000 shares that it hoped to acquire from Finch. The only reason why Twin Fires had any possibility of acquiring 75,000 shares of a “hot” IPO was because Stephens Dunne, through his brother Dwight, was put in touch with Dwight’s brother-in-law, Finch, who claimed that he would be given a huge allocation of shares in the IPO which he was willing to sell to Dunne to attract wealthy members of the John Deere family as clients. Twin Fires never “earned” this opportunity; it obtained it solely through family contacts and the wealth of its members, which made it an attractive client to Finch. While Finch certainly acted badly and, as will be discussed later, Morgan Stanley acted carelessly, the interests of justice are better served by a remedy that compensates Twin Fires for its reliance damages but does not give it the benefit of a bargain it never should have had.[21]
The evidence as to reliance damages is sparse and undocumented. There, however, was evidence that Dunne and Dlugasch retained the law firm of Holland & Knight, LLP to establish Twin Fires and perform the legal work necessary for this LLC to serve as the investment vehicle for the purchase of WEBM IPO shares. Dlugasch testified that those legal fees were roughly $16,000. In addition, Dlugasch testified that, in the early part of the busy tax season, he devoted at least 70 hours of work to Twin Fires, which at his hourly rate of $295 per hour had a value of $20,650. He also testified that Sharon Kams, another accountant at Waldron Rand, spent roughly 30 hours on Twin Fires matters, which at her hourly rate of $100 per hour had a value of $3,000. While Waldron Rand had not yet billed Twin Fires for this work in view of what transpired, it constitutes at least a prospective liability of Twin Fires and therefore qualifies as compensable reliance damages. Totaling these three figures, this Court awards reliance damages to the plaintiffs for the defendants’ intentional misrepresentation in the amount of $39,650.
3. Violation of the Massachusetts Blue Sky Law, G.L.c. 110A
The plaintiffs contend that Finch and Morgan Stanley are also liable to them under G.L.c. 110A, §410(a) (2) for violation of what is formally known as the Uniform Securities Act and commonly known as the Massachusetts Blue Sky Law. That statutory provision declares that “any person who . . . offers or sells a security by means of any untrue statement of a material fact..., the buyer not knowing of the untruth or omission, ... is liable to the person buying the security from him . ..” G.L.c. 110A, §410(a)(2).[22] This Court finds, for two reasons, that neither Dunne nor *561 Twin Fires have standing to sue for civil liability under this provision because neither actually bought WEBM IPO shares.
First, even if Finch and Morgan Stanley had offered these securities to Dunne and Twin Fires, any Blue Sky civil liability would be limited “to the person buying the security from him” and Dunne and Twin Fires never succeeded in buying the WEBM securities. See G.L.c. 110A, §410(a)(2). While the plaintiffs contend that Twin Fires bought these securities by agreeing to purchase them, this Court has already found that no purchase of these shares could have occurred until the condition precedent of an allocation to Finch of at least 75,000 shares was satisfied, which it never was.
Moreover, the sole remedy provided in the Blue Sly statute is akin to rescission, and that remedy assumes a completed sale with the transfer of consideration. Under G.L. 110A, §410(a) (2), the statutory remedy available to the buyer enables the buyer “to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys fees, less the amount of any income received on the securiiy, upon the tender of the security . . .” Where, as here, no consideration was paid, recovery of the consideration is impossible. If the Legislature had wished to provide a remedy for those who never paid consideration for the purchase of a security, it would have provided a remedy that granted more than recission damages. See generally Schinkel v. Maxi-Holding, Inc., 30 Mass.App.Ct. 41, 49 (1991) (“The scheme of c. 110A, geared primarily to protecting securities buyers from fraudulent representations, probably offers no remedy to one whose chief complaint is nondelivery of shares promised”).
Second, since the Massachusetts Blue Sky Laws were derived from federal securities laws, their interpretation must be guided by the interpretation of those federal laws and their application coordinated with the application of those federal laws. See Cabot Corp. v. Baddour, 394 Mass. 720, 723 (1985); In re Choinski, 214 B.R. 515, 523 (1st Cir. 1997), aff'd., 187 F.3d 621 (1998). It is well-settled that, under Section 12 of the Securities Act of 1933, 15 U.S.C. §771, the federal counterpart to G.L.c. 110A, §410(a)(2), “(t]he purchase requirement clearly confines §12 liability to those situations in which a sale has taken place.” Pinter v. Dahl, 486 U.S. 622, 644 (1988). See also Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 736 (1975). There is no reason to believe that the Massachusetts Legislature intended to extend §410(a)(2) liability beyond the scope of §12 liability.
Consequently, since the Massachusetts Blue Sky Laws grant a statutory civil remedy for false misrepresentations only to those who have purchased securities, and since the plaintiffs never actually purchased the WEBM shares, the plaintiffs have no standing to sue to obtain this statutory civil remedy. Judgment on this claim must be awarded to the defendants.
Violation of G.L.c. 93A
The plaintiffs’ inability to obtain the remedies available under the Massachusetts Blue Sky Laws for Finch’s misrepresentations has little practical consequence, since they plainly can seek an even more expansive remedy under G.L.c. 93A.
G.L.c. 93A, §2(a) makes unlawful any “unfair or deceptive acts or practices in the conduct of any trade or commerce.” G.L.c. 93A, §2(a). “Trade and commerce” includes the offering for sale of securities. G.L.c. 93A, § 1 (b). The Supreme Judicial Court has stated “that the following are ‘considerations to be used in determining whether a practice is to be deemed unfair: (1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) . . . is immoral, unethical, oppressive, or unscrupulous; (3) . . . causes substantial injury [to] . . . competitors or other businessmen.’ ” Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986), quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975), quoting 29 Fed.Reg. 8325, 8355 (1964).
There can be no doubt that Finch’s fraudulent misrepresentations regarding the likelihood of his obtaining a substantial special allocation of WEBM shares are sufficient alone to support a finding that he and, vicariously, Morgan Stanley engaged in unfair or deceptive acts in trade or commerce. Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. at 778. This Court, having already found in favor of the plaintiffs on their claim of common-law deceit based on these intentional misrepresentations, now finds that these same intentional misrepresentations constituted unfair and deceptive acts in trade and commerce. This Court, therefore, finds in favor of the plaintiffs on their G.L.c. 93A, §11 claim.
Having found in favor of the plaintiffs on their G.L.c. 93A claim, the plaintiffs shall be awarded their reasonable attorneys fees and costs incurred in this action. No later than January 10, 2003, the plaintiffs shall serve upon defense counsel their application for attorneys fees and costs, with appropriate supporting documentation. The defendants shall file this application, with their response, no later than January 31, 2003.
The damages under the G.L.c. 93A claim are the same reliance damages awarded on the common-law claim of fraudulent misrepresentation — $39,650. This Court, however, finds that Finch’s fraudulent misrepresentations were willful and knowing “unfair and deceptive acts” that require the damage award to be at least doubled and potentially trebled. See G.L.c. 93A, §11. In view of the circumstances of this case, this Court, for at least three reasons, believes that the *562 interests of justice warrant the trebling of this damage award.
First, this Court recognizes that the amount awarded in reliance damages does not fully compensate the plaintiffs for the injuries they suffered from Finch’s fraudulent misrepresentations. Finch knew or should have known that Dunne was speaking to many members of his family about the extraordinary investment opportunity that he had discovered, that he was obtaining large amounts of money from them to invest in this opportunity, and that, frankly, he would look like a fool if it turned out there was truly no meaningful chance of Twin Fires obtaining the 75,000 shares. Finch could monitor from his desktop computer the many wires from various individuals that were coming into Morgan Stanley in the days before the IPO transferring money into the Twin Fires account, and he knew or should have known that this money was corning in for one purpose — to purchase the WEBM shares that Finch had said he would deliver to Twin Fires. Finch apparently was prepared to permit this terrible embarrassment in the hope that he could somehow retain these wealthy members of the Deere family as clients by blaming Merrick and Morgan Stanley for his failure to obtain the special allocation. His egregious disregard for the humiliation he would cause by failing to deliver on the expectations he had fostered through his intentional misrepresentations warrants trebling of the damages.[23]
Second, this Court is mindful that, in this and similar cases involving “hot” IPOs, reliance damages are likely to be trivial in comparison with expectation or benefit of the bargain damages, so the trebling of reliance damages is needed to deter fraudulent misrepresentations like those found here.
Third, treble damages are warranted here to punctuate the point that, while Finch alone made the fraudulent misrepresentations, Morgan Stanley’s abysmal supervision of Finch and its pathetic failure to communicate its share limit for “hot” IPOs permitted this travesty to occur. This Court has not considered the plaintiffs’ claim of negligent supervision against Morgan Stanley because such a claim would potentially be relevant only if there were a question as to whether Morgan Stanley was liable for Finch’s misconduct. Since Morgan Stanley properly has conceded that it is vicariously liable for all that Finch did as a Morgan Stanley broker, its liability depends solely on whether Finch was acting within the scope of his employment (which he plainly was), not on whether Morgan Stanley negligently supervised him. Morgan Stanley’s conduct, however, properly may be considered by this Court in deciding in its discretion the amount of punitive damages under G.L.c. 93A, so this Court makes findings on that issue only for this purpose.
This Court finds that Morgan Stanley was negligent in its supervision of Finch in at least three fundamental ways. First, Morgan Stanley knew from past experience that, when a stockbroker was the originator of an IPO, the CEO of the issuing company sometimes requested a special allocation of IPO shares to the originating broker to reward him for his role in bringing the company public. It knew here that Finch was the originator of the WEBM IPO, that this would be a “hot” IPO, and that Finch had grandiose hopes for an allocation as large as the 250,000 — 300,000 shares that Keller had been promised by the CEO before his IPO collapsed. It knew or should have known that Finch would be taking GEIs from his clients for the WEBM IPO, and it certainly should have been concerned about what Finch was telling his clients when he took their GEIs about the likelihood of his obtaining a special allocation and the anticipated size of that allocation. Yet, no one at Morgan Stanley discussed these matters with him, furnished him with any guidance or guidelines, or even monitored his GEIs. When the possibility of a special allocation was discussed with him, the discussion had been initiated by Finch, and the only guidance he was given was to curry favor with the CEO. In short, Morgan Stanley knew or should have known:
that it had a 28-year-old broker with less than three years experience as a stockbroker and less than two years as a Morgan Stanley broker;
that this young broker hoped to obtain a special allocation of between 250,000 and 300,000 shares in a “hot” IPO that he had originated;
that these IPO shares were expected to multiply in value within days of public trading (probably on the first day of public trading), and therefore were in great demand;
that this young broker had a meager client base but, as Finch declared in his goals for 2000, hoped through this IPO to manage $400 million in assets by the end of 2000; and
that the prospect-of receiving “hot” IPO shares was commonly used by Morgan Stanley brokers to attract new clients.
This was foreseeably a situation laden with danger, yet Morgan Stanley did absolutely nothing either to furnish guidance to Finch, to supervise him, or even to monitor his conduct.
Second, Morgan Stanley policy placed a 2,000-share cap on the amount of IPO shares that could be sold to any retail client and a 1,000 share-cap for “hot” IPOs. It had declared the WEBM IPO to be “hot” and therefore, in the absence of special authorization from the Retail Deal Captain, permitted no single retail customer to purchase more than 1,000 of these shares. If this policy had been effectively communicated to Finch and to prospective retail purchasers of WEBM shares, the misrepresentations here, or at least the misplaced reliance on them, may never have occurred. Yet, no one at Morgan Stanley ever told Finch, *563 either orally on in writing, that there was a 1,000-share cap for the WEBM IPO, and he did not know either of this cap or of the more general 2,000-share cap that applied to all IPOs. In fact, even Caswell, the Wellesley branch manager, did not know of the 1,000-share cap on the WEBM IPO until the IPO was over. Certainly there was no reasonable way that prospective purchasers of these shares would learn of this Morgan Stanley policy except through their broker. Consequently, Morgan Stanley had a policy limiting retail sales of WEBM IPO shares but failed to tell its retail brokers (or even its retail branch managers) about such a policy. It specifically failed to mention this policy to Finch, its one retail broker who it knew was hoping for a special allocation of more than 250,000 shares and therefore would have been most likely to exceed this policy limit.
Third, Morgan Stanley’s thoughtless policy and practice regarding the taking of GEIs unwittingly invited the dangers it warned against in its Compliance Guide. Even though Morgan Stanley’s policy was to bar sales of more than 1,000 shares of a “hot” IPO to retail clients, it did not bar its brokers from taking GEIs of more than 1,000 shares (or, indeed, more than 2,000 shares) from retail clients. Consequently, a client could ask to buy 75,000 shares of a “hot” IPO and the broker could record it as a GEI from that client, even though the client would be barred from receiving that many shares. Neither policy nor practice at Morgan Stanley required its brokers to inform a client who sought to purchase a quantity of shares beyond the share cap of the existence of any such share cap. Indeed, the mere fact that a GEI would be accepted for more than 1,000 shares encouraged the retail customer to believe that there was no prohibition against such a sale. Nor did Morgan Stanley, in practice, require its brokers to submit a list of the names clients who gave GEIs and the amount of shares those clients hoped to purchase; brokers were permitted simply to submit the aggregate number of shares their clients hoped to purchase. As a result, no person responsible for compliance at Morgan Stanley had the information that would permit them to know that a broker was discussing with a retail client the possibilof purchasing more than 1,000 shares (indeed, 75,000 shares) in a “hot” IPO. In essence, while the Compliance Guide, in its discussion of IPOs, specific-warns that “ ‘sales talk’ can be easily misinterpreted, especially if an issue is in heavy demand and client is anxious to obtain shares,” Morgan Stanley’s practice regarding GEIs both invited misinterpretation clients and prevented effective compliance.
For all these reasons, not only does Finch’s conduct warrant “condemnation and deterrence,” but so, too, does Morgan Stanley’s conduct. See Bain v. City of Springfield, 424 Mass. 758, 767 (1997). Especially since this Court has rejected the plaintiffs’ call for benefit of the bargain damages, the award of treble reliance damages is a necessary “wake-up call” to Morgan Stanley (and perhaps the entire securities industry) that its policies, practices, compliance, and supervision regarding IPOs, especially “hot” IPOs, are seriously flawed.
ORDER
For the reasons stated above, it is hereby ORDERED that judgment enter in favor of the plaintiffs Dunne and Twin Fires and against the defendants Finch and Morgan Stanley, jointly and severally:
On the claim alleging fraudulent misrepresentation, in the amount of $39,650; and
On the claim alleging violation of G.L.c. 93A, in the amount of $118,950 ($39,650 trebled).
Having found in favor of the plaintiffs on their G.L.c. 93A claim, the plaintiffs shall be awarded their reasonable attorneys fees and costs incurred in this action. No later than January 10, 2003, the plaintiffs shall serve upon defense counsel their application for attorneys fees and costs, with appropriate supporting documentation. The defendants shall file this application, with their response, no later than January 31, 2003.
Statutory costs shall be awarded to the plaintiffs.

As branch syndicate coordinator, Curtis allocated among the brokers within the branch the IPO shares that were allocated to the branch by Morgan Stanley’s Retail Equity Syndicate.

I credit Katharine Dunne’s testimony, offered via her deposition, in part because her late husband was a stockbroker and she understood the importance of such an allocation. In fact, she recalled telling Finch at the time that she was surprised at the amount of shares he was being allocated.

Finch sent Merrick a bottle of wine to celebrate the filing.

When Morgan Stanley merged with Dean Witter, the Morgan Stanley retail brokers were assigned to Private Wealth Management, while the Dean Witter brokers handled their clients through the branches. Over time, even as the historical distinction eroded between the Morgan Stanley and the Dean Witter brokers, Private Wealth Management continued as a separate retail brokerage group.

As noted earlier, this letter was mis-dated January 5, 1999.

As will become clear later in this decision, Finch never did anything to assure himself that those who would receive WEBM IPO shares “realized the long-term value” of WEBM. Indeed, he expected that all who bought shares from him would sell them quickly for a profit, so he only discussed the anticipated value of these shares in the short mn after-market. EVen his fiancee, to whom he sold 25 WEBM IPO shares, sold them the same day for a handsome, quick profit.

Merrick also requested an increase in the allocation made to certain institutional investors, which Morgan Stanley also honored.

This Court believes that Dunne added this vignette to explain why there was no writing memorializing an offer of this size, since Morgan Stanley has argued that this Court should infer the absence of such an offer by the absence of such a writing. While this Court does not find that Dunne’s version has the ring of truth, it also does not find that the absence of any writing should reasonably reflect the absence the offer. There was abundant testimony that agreements *564 in the securities industry are virtually always made orally, regardless of their size, and confirmed in writing only after the transaction has been completed. There is not a shred of evidence that deals of this size are routinely confirmed in writing before the transaction has taken place. Indeed, the weight of the evidence is that pre-transaction confirmations are rare and, indeed, discouraged by Morgan Stanley. All written communications that are transmitted by mail with clients regarding securities transactions at Morgan Stanley must first be reviewed by the Compliance Department, which naturally tends to discourage such communications. E-mail communications need not be sent to the Compliance Department for review but all recipients of e-mails from Morgan Stanley received a notice declaring:
It is important that you do not use e-mail to request, authorize or effect the purchase or sale of any security or commodity, to send fund transfer instructions, or to effect any other transactions. Any such request, orders, or instructions that you send will not be accepted and will not be processed by Morgan Stanley Dean Witter.
Having created a way of doing business that relied on oral agreements between a broker and his client and that discouraged the written memorialization of these oral agreements, Morgan Stanley cannot justly ask this Court to infer that the absence of a confirmatory writing means the absence of an agreement.

It is important to note that Finch was not the only person at this January 19 meeting who was trying to impress. The only reason that Dunne brought Finch to see his real estate development projects on their way to lunch was to communicate to Finch that Dunne was more than a young man with a trust fund. Rather, he was a real estate developer in his own right, capable of obtaining financing and bringing such projects to fruition.

Dunne understood that Finch was referring to a meeting with Merrick but Finch actually planned to go to resolve matters with Legg regarding the Directed Shares accounts. Finch never actually went to Virginia during this time period.

 Dunne also asked Finch for a form for Gilpin Sulky LLC, an existing investment vehicle he had been using for investments other than WEBM.

There is a dispute as to whether the meeting with Finch, Dlugasch, and Kams occurred on the morning of February 3 or 4. This Court is persuaded by the date the account opening form was faxed to Dlugasch (the morning of February 3), and the date given on the $100 check (February 4), that this meeting was more likely than not held at 8:30 a.m. on February 4.

Dunne testified that he spoke with Finch by telephone on February 9, and Finch told him that he had received his 300.000 share allocation. I do not credit Dunne’s testimony as to this conversation. If Finch had truly said this, Dunne would have pressed even harder for additional shares beyond the 75,000.

Flnch prepared a handwritten GEI sheet but he never submitted it to anyone. According to his GEI list, Twin Fires’ interest in purchasing WEBM shares was “unlimited.” Many of the GEIs on Finch’s sheet would have greatly exceeded the 1.000 share limit that Morgan Stanley imposed on “hot” IPOs.

Under the Directed Shares Program, if a WEBM employee chose not to purchase any or all of the 800 shares allocated to him, those shares returned to the Directed Share pool and the pool was later distributed equally among the employees who wished to buy additional shares.

This Court does not find Dunne’s version of this conversation to be credible. He testified that Finch directed him to have an amount sufficient to purchase 75,000 WEBM shares at $35 per share wired to the Twin Fires in the morning, and Dunne agreed to do this. Since Finch knew there was no actual need for this money to be wired into the account prior to the trade, it is unlikely that he made this demand, leather, this is an instance of Dunne trying to “improve” his memory to provide evidence of a promise by Finch to sell 75,000 shares after the registration became effective.

Dwight Dunne had a wholly different vision of his brother’s mood that morning. He testified that he spoke with Stephens before 10 a.m. and Stephens told him, “Your worst fears have been realized.” This Court is inclined to credit this testimony, but it does not adopt the inference that Morgan Stanley takes from this testimony — that Stephens Dunne knew early that morning that Twin Fires would obtain no shares in the IPO. This Court credits the testimony of those who were present in Dlugasch’s office on the afternoon of February 11 that Dunne was giddy with excitement when he watched the surge in the after-market price of WEBM and appeared stricken with grief when he learned that Twin Fires had not obtained any IPO shares. Dunne may not have been truthful in all his testimony, but he could not have been that good an actor that day. Therefore, this Court believes it more likely than not that what Stephens Dunne meant that morning was that he (Stephens) would be the hero of the family that day and, given the unhappy relationship between these brothers, Stephens’ triumph would be the realization of Dwight’s worst fear.

This Court recognizes, as has the Appeals Court, that the distinction between a condition precedent and a condition subsequent is often hard to understand and “the source of considerable confusion.” City of Haverhill v. George Brox, Inc., 47 Mass. App. 717, 723 (1999). While this Court believes that the special allocation of at least 75,000 shares of WEBM was a condition precedent because it defined “an event which must occur before a right or obligation matures under the contract, ” id. at 719, it would not affect this decision if it were viewed as a condition subsequent, since the only practical consequence of that distinction here concerns who bears the burden of proving the occurrence of the condition. See generally 14 Alperin and Shubow, Massachusetts Practice Summary of Basic Law §7.84 (3rd ed. 1996). Since there is no dispute that Finch did not receive a special allocation of 75,000shares, it matters little who has the burden of proving that undisputed fact.

There was no evidence that Massachusetts is one of those states.

Morgan Stanley also contends that the plaintiffs’ reliance was not reasonable because only large institutional investors could possibly have received an allocation of75,000 shares in this type of “hot” IPO. Certainly, anyone at Morgan Stanley with access to the list of persons and institutions receiving IPO shares should reasonably have recognized that it would have been extraordinary for an investment vehicle like Twin Fires to receive so large an allocation, but none of the plaintiffs had access to such information.

This Court need not consider whether Finch’s misrepresentations could also be deemed negligent misrepresentations because, as noted earlier, the measure of damages for negligent misrepresentation would also be limited to reliance damages.

This statute permits an affirmative defense to liability when the seller of the security proves that he did not know, and could not have known in the exercise of reasonable care, of the untruth. G.L. 110A, §410(a)(2). In view of this Court’s legal conclusions, the existence of this affirmative defense is of no consequence in this case.

The humiliation caused by Finch is most poignantly demonstrated by Dunne’s choice to begin the day of February 11 with a visit to his father’s grave, so that his father somehow could share in what Dunne believed was to be a great day for the Deere family.